Filed 10/9/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PREM BIKKINA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAGAN MAHADEVAN,<br><br>    Defendant and Appellant. | A143031<br><br>(Alameda County<br>Super. Ct. No. RG14-717654) |

**I.**

**INTRODUCTION**

Appellant Jagan Mahadevan (Mahadevan) appeals from the denial of his special motion to strike pursuant to California's anti-SLAPP statute (Code Civ. Proc., § 425.16)[1] filed in response to respondent Prem Bikkina's (Bikkina) complaint alleging that Mahadevan made false and libelous statements about Bikkina's research. The trial court denied the motion, finding Mahadevan's statements did not arise from protected activity. We agree with the trial court and further conclude that, even if the conduct arose from protected activity, the claims have sufficient merit to survive a motion to strike. Therefore, we affirm.

---

[1] SLAPP is an acronym for "strategic lawsuit against public participation." All further statutory references are to the Code of Civil Procedure unless otherwise noted.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Bikkina's Complaint*

We begin with the facts alleged in the complaint. In 2007, Bikkina entered a Ph.D. program at the McDougall School of Petroleum Engineering at the University of Tulsa (University). Mahadevan was his dissertation advisor and supervisor from 2007 to 2010. Bikkina complained that Mahadevan was repeatedly reassigning him to different projects and requested a new advisor, which he was given in May 2010. In March 2011, Bikkina published a scientific paper on carbon sequestration (Paper 1) that Mahadevan believed contained inaccuracies. The dispute over the paper led both Bikkina and Mahadevan to file formal complaints alleging violations of the University's harassment policy. The University found that Bikkina had not violated the policy, but instead that Mahadevan had committed "serious violations."

In 2011, Bikkina published a second scientific article in a professional journal (Paper 2) and Mahadevan claimed he was a co-author. Bikkina submitted a second formal complaint to the University. The University concluded Mahadevan had no co-authorship rights.

In March 2012, Mahadevan filed a complaint against Bikkina under the University's ethical conduct policy claiming Bikkina had falsified data in Paper 2 and plagiarized Mahadevan's work. In April 2013, Mahadevan filed another complaint with the vice provost for research stating that Bikkina had engaged in plagiarism and falsified data in his dissertation.

In May 2013, the senior vice provost for the University found that Mahadevan had violated the University's harassment policies through bad faith efforts to interfere with and undermine Bikkina's research, publications, and reputation. The provost found that Bikkina had engaged in no harassment, unethical conduct, plagiarism or academic misconduct.

In June 2013, Bikkina completed his Ph.D. and began working at Lawrence Berkeley National Laboratory (LBNL). Shortly thereafter, Mahadevan contacted one of

2

Bikkina's superiors to inform him that Bikkina had falsified the data in Papers 1 and 2. On August 30, 2013, Mahadevan made a presentation at LBNL and told Bikkina's colleagues that Bikkina had published a paper using false data. Mahadevan also contacted LBNL's research and institutional integrity officer to claim Bikkina had falsified data.

In March 2014, Bikkina filed a complaint for damages against Mahadevan alleging four causes of action: (1) libel per se for Mahadevan's published written statements to the University and LBNL that Bikkina had falsified data and plagiarized Mahadevan's work; (2) negligence for Mahadevan's course of conduct; (3) intentional infliction of emotional distress and; (4) slander per se for Mahadevan's oral statements to University and LBNL employees.

### B. *Mahadevan's Anti-SLAPP Motion to Strike*

Mahadevan filed a special motion to strike Bikkina's complaint pursuant to section 425.16. Mahadevan argued that Bikkina improperly sought to chill public discourse on carbon sequestration and its impacts on global warming. Mahadevan asserted that his statements concerned important public issues and constituted protected speech. He further argued that Bikkina could not prevail on the merits because all his statements were true and fell under the common interest privilege in Civil Code section 47, subdivision (c).

Mahadevan submitted a declaration supporting his motion which set forth his version of the underlying facts. The declaration stated that Bikkina worked under his supervision on research relating to carbon dioxide sequestration. Bikkina's research used contaminated data and did not follow proper procedures. After leaving Mahadevan's research group, Bikkina published Paper 1 which was based upon the contaminated data, specifically relying on a quartz sample contaminated by fluorine deposits.

Mahadevan asserts that Paper 2 contained content that he had originally authored. He claims Paper 2 originally listed him as a co-author but his name had been deleted. He contacted the listed co-author to inform him that Paper 2 was the product of his intellectual efforts.

3

In 2013, Mahadevan spoke to an "audience of scientists" at LBNL about the contamination of Bikkina's data because they had an interest in the issue and had either used Bikkina's false data or cited to it.

Mahadevan also supported his motion with the declaration of Dr. Winton Cornell, a professor at the University. Cornell stated that he once saw Bikkina using a sample of quartz crystal that appeared to be contaminated, but he had no knowledge as to whether this contaminated sample formed the basis of Bikkina's research papers. He stated he is aware of one scholarly article that raised concerns about Bikkina's research and techniques.

Bikkina filed an opposition to the motion to strike, arguing Mahadevan's statements were not made in a public forum and did not concern matters of public interest. He contended that the motion also failed because his claims had "minimal merit." He argued Mahadevan's comments were not conditionally privileged, and further that there was evidence the statements were made with malice.

In support of his opposition, Bikkina submitted the declaration of Winona Tanaka, the senior vice provost for the University (the provost). The provost handled the various complaints and investigations related to Mahadevan's allegations. She confirmed Mahadevan complained about Paper 1, disowned any interest in the paper's contents, and demanded that Bikkina correct inaccuracies. Bikkina submitted a formal complaint against Mahadevan alleging that Mahadevan had presented false and wrongful claims about Bikkina's research. He further alleged that Mahadevan had told him, "Prem, I am going to screw you."

In 2011, the provost appointed a three-member investigatory committee to investigate the complaints filed by both men. The provost issued a final decision and concluded that Mahadevan had repeatedly violated the University's harassment policy and that these violations were abusive and egregious. The decision listed a series of sanctions against Mahadevan. After reviewing the decision, Mahadevan stated that he would resign from the University, where he had been recently denied tenure, in exchange for an agreement that the provost not finalize the decision regarding his conduct.

4

After leaving the University, Mahadevan contacted the co-authors of Paper 2 claiming he had co-authorship rights to the paper. The provost reviewed emails from Mahadevan to Bikkina's co-author, Dr. Ramgopal Uppaluri, claiming co-authorship rights. The investigatory committee, however, found that Mahadevan had disassociated himself from Bikkina's research, given his permission for Bikkina to use the data, and that Bikkina had been given University approval to publish the research.

Bikkina filed a second formal complaint in response to Mahadevan's allegations about co-authorship rights to Paper 2. The provost sent a letter to Bikkina's co-author, Dr. Uppaluri, stating that Mahadevan had no ownership or authorship rights to any of the data or content of Paper 2. Mahadevan then filed two additional formal complaints in 2012 and 2013 claiming Bikkina had falsified data in Paper 1, plagiarized Mahadevan's work in Paper 2, and committed plagiarism and data falsification in his dissertation. The provost conducted a further investigation and issued a formal memorandum of decision concluding that all of Mahadevan's complaints against Bikkina were "wholly unfounded and spurious." She found that Mahadevan had disclaimed ownership and disassociated himself from Bikkina's research and relinquished any right to control the research or data. She further found that Mahadevan "has repeatedly violated the Harassment Policy by knowingly and in bad faith making false accusations against Mr. Bikkina regarding Paper #1 and Paper #2 and engaging in conduct that is defamatory, retaliatory, demeaning, intimidating, threatening and otherwise harmful [conduct] to Mr. Bikkina's educational and professional reputation on and off campus." She further concluded that Mahadevan had violated the University's ethical conduct policy by "making false allegations that were grounded in bad faith and with malicious intent to damage Mr. Bikkina's reputation, research and scholarship on and off campus." She concluded that Bikkina had not committed plagiarism.

Timothy Kneafsey, a department head at LBNL and Bikkina's supervisor, submitted a declaration stating that Mahadevan appeared at his office without an appointment and told him that Bikkina published a paper using falsified data. The research and institutional integrity officer for LBNL, Meredith Montgomery, was also

5

contacted by Mahadevan who stated that Bikkina had falsified data in a research article. Montgomery reviewed the University's investigation and report and found it dispositive of the issue. Montgomery sent Mahadevan a letter that his claims were unsubstantiated and in bad faith.

Tetsu Tokunaga, a scientist at LBNL, declared that he attended the August 2013 lecture Mahadevan gave at LBNL. At the end of the lecture, Mahadevan showed slides of Bikkina's data and stated there were problems with the research. The slides did not appear to be related to Mahadevan's lecture. The LBNL lecture was made to approximately 25 employees.

### C. Trial Court's Ruling on the Motion to Strike

At a hearing, the parties addressed the court's tentative ruling denying the motion. Mahadevan argued that his statements related to a matter of public interest under section 426.15, subdivision (e)(4).[2] He relied on *Taus v. Loftus* (2007) 40 Cal.4th 683 (*Taus*) to support his contention that his comments and speech about global warming were of widespread public interest.

In a written order, the court denied the motion to strike finding "[w]hile the content of any scholarly works may arguably concern a matter of public interest, the facts here do not invoke the SLAPP statute." Citing *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122 (*Weinberg*), the court concluded that a matter of public interest must concern a substantial number of people and is not something of concern only to the speaker or a small group of people. The court found that the statements were not made in a public forum, but were made to individuals and attendees at a scientific conference.

---

[2] Under section 425.16, the initial inquiry is whether the moving defendant has made a threshold showing that the challenged causes of action arise from protected activity which includes: (1) written or oral statements made before a legislative, executive, or judicial proceeding; (2) written or oral statements made in connection with an issue under consideration or review by a legislative, executive, or judicial body; (3) written or oral statements made in a place open to the public or in a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e).)

The court also concluded that because Mahadevan did not meet his burden of demonstrating the complaint arose from his protected activity, it need not decide whether Bikkina could demonstrate a probability of success on the merits.

## III.

## DISCUSSION

### A.  Standard of Review for Granting a Special Motion to Strike

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Our Supreme Court has outlined the two steps involved in applying the anti-SLAPP statute: " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. (§ 425.16, subd. (b)(1).)  If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819–820 (*Oasis West*).)  Only a cause of action that arises from protected speech and lacks even minimal merit is subject to being stricken under the anti-SLAPP statute.  (*Id.* at p. 820.)

We review de novo an order granting or denying a motion to strike under section 425.16.  (*Oasis West*, *supra*, 51 Cal.4th at p. 820.)  "In considering the pleadings and supporting and opposing declarations, we do not make credibility determinations or compare the weight of the evidence.  Instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law."  (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 928-929.)

7

### B. The First Prong—Protected Activity or Speech

Mahadevan argues on appeal that his statements about Bikkina's research related to matters of public interest and constitute protected speech. Mahadevan contends that the trial court only considered section 425.16, subdivision (e)(3) as to whether the statements were made in a place open to the public or a public forum and did not properly consider section 425.16, subdivision (e)(4). We conclude Mahadevan's statements were not protected activity under either subdivisions (e)(3) or (e)(4).

A claim is subject to the anti-SLAPP statute under section 425.16, subdivision (e)(3) if it is an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" as including: "(3) any written or oral statement or writing *made in a place open to the public or a public forum* in connection with *an issue of public interest.*" (Italics added.) To come within section 425.16, a statement must not only be made in a " 'place open to the public or a public forum,' " it must also be made " 'in connection with an issue of public interest.' " *(Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039 (*Nygard*).)

Mahadevan contends that his statements were made in public settings or in communications to a large number of people. This is not an accurate characterization. Mahadevan's statements were made to faculty at the University and researchers at LBNL; they were not made in a place open to the public or a public forum. (§ 425.16, subd. (e)(3).) His statements were not reported in the media (see *Nygard*, *supra*, 159 Cal.App.4th at p. 1038 [newspaper is a public forum]) or posted on a Web site (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 693 (*Summit Bank*) [Internet message boards are places " 'open to the public or a public forum' " for purposes of § 425.16, subd. (e)].) "In our view, whether a statement is 'made in a place open to the public or in a public forum' depends on whether the means of communicating the statement permits open debate." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 896-897 (*Wilbanks*).)

Initially, Mahadevan's statements were made during the University complaint process to University faculty and were not part of an open debate. He then made the

same complaints to a specialized group of scientists at LBNL.[3] The fact that Mahadevan made statements about the alleged faulty data in Bikkina's research at a lecture to a small number of LBNL scientists does not constitute a public forum under subdivision (e)(3). Therefore, the court did not err in concluding that Mahadevan failed to make a prima facie finding that his challenged conduct was protected activity under subdivision (e)(3).

As to his alternative argument that this speech was protected under subdivision (e)(4), we agree with the trial court's conclusion that the statements were not made concerning matters of public interest. "Section 425.16 does not define 'public interest,' but its preamble states that its provisions 'shall be construed broadly' to safeguard 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' [Citation.]" (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 693.) " 'The definition of "public interest" within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.]' [Citations.]" (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 115 (*Du Charme*).)

Mahadevan contends that his criticism of Bikkina's data was on a topic of public interest because it relates to "one of the most important issues of our time—climate change and greenhouse gases." Thus, he argues the trial court incorrectly relied on *Weinberg*, *supra*, 110 Cal.App.4th 1122 when it concluded that his criticism of Bikkina was not a matter of public interest. He asserts that even though his statements at LBNL

---

[3] Mahadevan's letter to the editor of the International Journal of Greenhouse Gas Control entitled "*Comments on the Paper Titled 'Contact angle measurements of $CO_2$-water-quartz/calcite systems in the perspective of carbon sequestration': A case of contamination?*" <http://www.sciencedirect.com/science/article/pii/S1750583611001721> (as of Oct. 9, 2015) could be considered part of a scholarly debate on the topic and may constitute protected speech, but this letter was not the subject of Bikkina's complaint or the motion to strike.

were made to a small group of attendees, they were addressed to "the entire scientific community," establishing the public nature of the dispute.

In *Weinberg*, defendant, a token collector, made statements to the token collector community that plaintiff was dishonest and had stolen a token from him. (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1126.) He published an advertisement in the token collector newsletter, sent letters to other collectors, and discussed his allegations at the token collector society. (*Id.* at p. 1128.) Plaintiff sued for libel and slander. Defendant brought an anti-SLAPP motion claiming that his statements served the public interest by discussing criminal activity. (*Ibid.*) The court concluded that defendant's "private campaign" to discredit plaintiff to a relatively small group of fellow collectors was a private matter. (*Id.* at p. 1127.) The fact that the statements accused plaintiff of criminal conduct did not make them a matter of public interest. (*Ibid.*)

The *Weinberg* court surveyed the case law to discern what constitutes a matter of public interest and found public interest does not equate "with mere curiosity," and should be of "concern to a substantial number of people. [Citation.]" (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1132.) "[A] matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citations.]" (*Ibid.*) Conversely, a person cannot turn an otherwise private matter into a matter of public interest simply by communicating it to a large number of people. (*Id.* at p. 1133.)

Like the conduct in *Weinberg*, Mahadevan's statements were made to a small, specific audience: University faculty and LBNL scientists. His broad assertions about the public interest in climate change are not closely connected to his actual statements. Mahadevan statements were specific complaints about contaminated quartz samples and plagiarism in two papers that were not distributed to a broad audience.[4] Simply because carbon sequestration is related to climate change, it does not convert his technical objections into a topic of public interest. Mahadevan's speech was a private campaign to

---

[4] Paper 1 was published in the International Journal of Greenhouse Gas Control and Paper 2 was published in the Journal of Chemical and Engineering Data.

10

discredit another scientist at the University, and later at LBNL, and not part of a public debate on a broader issue of public interest.

Mahadevan fails in his effort to distinguish the decision by Division Two of this appellate district in *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913 (*Rivero*). Rivero was a janitorial supervisor on the University of California, Berkeley campus. (*Id.* at p. 916.) The union published and distributed documents claiming Rivero engaged in misconduct. (*Id.* at pp. 916-917.) The union argued that they raised issues of public interest because abuse in the university system impacted the whole community of public employees. (*Id.* at p. 919.) The court concluded that the statements were not a matter of public interest because Rivero supervised a small staff, was not a public figure, and the publication of information in the union newsletter was not sufficient to make it a public issue. (*Id.* at pp. 924-926.) Although case law did not define the precise boundaries of "public issue," in each of the cases, "the subject statements either concerned a person or entity in the public eye [citations], conduct that could directly affect a large number of people beyond the direct participants [citations] or a topic of widespread public interest [citation]." (*Id.* at p. 924.)

Similarly here, Bikkina was not a public figure, the dispute about an allegedly contaminated quartz sample did not affect a large number of people, and the two scientific papers were not a topic of widespread public interest. Even recognizing public interest in climate change generally, there was no public interest in the private dispute between Mahadevan and Bikkina about data in papers on carbon sequestration.

Mahadevan asserts that because the dispute was part of a scholarly debate on climate change, it is a subject of general public interest. The only evidence of an academic "debate" is one article published by the Society of Petroleum Engineers that mentions, in one sentence, Mahadevan's concerns that Bikkina's results may have been adversely affected by fluorine contamination.

Our Supreme Court addressed the issue of academic debate in *Taus*, *supra*, 40 Cal.4th at page 712, holding the plaintiff's cause of action arose from activity " 'in

11

furtherance of [defendants'] exercise of . . . free speech . . . in connection with a public issue' within the meaning of section 425.16." Plaintiff was the subject of a case study described in a "prominent scholarly article about long-repressed memory of childhood abuse." (*Id.* at p. 689.) Defendants published two articles raising doubts about the original article. (*Ibid.*) The court concluded that the articles were about a topic of "substantial controversy" in the mental health field. (*Id.* at p. 712.) Defendants were conducting an investigation of the research, writing about the topic and speaking at conferences all of which was conduct "in furtherance of [their] exercise of . . . free speech." (*Ibid.*)

Unlike *Taus*, there is no evidence that Bikkina's two papers were prominent scholarly articles about a topic in substantial controversy in the field of climate change. Mahadevan's statements were only remotely related to the broader subject of global warming or climate change, and involved specific accusations of plagiarism and use of a contaminated sample. "[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate. . . ." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898, citing *Du Charme*, *supra*, 110 Cal.App.4th 107; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111 (*Mann*) ["Although pollution can affect large numbers of people and is a matter of general public interest, the focus of the anti-SLAPP statute must be on the specific nature of the speech rather than on generalities that might be abstracted from it. [Citation.] . . . [¶] [D]efendants' alleged statements were not about pollution or potential public health and safety issues in general, but about [the plaintiffs'] specific business practices[,]" and did not fall within the anti-SLAPP statute].)

" ' "The fact that 'a broad and amorphous public interest' can be connected to a specific dispute is not sufficient to meet the statutory requirements" of the anti-SLAPP statute. . . . By focusing on society's general interest in the subject matter of the dispute instead of the specific speech or conduct upon which the complaint is based, defendants resort to the oft-rejected, so-called "synecdoche theory of public issue in the anti-SLAPP statute," where "[t]he part [is considered] synonymous with the greater whole." . . . In

evaluating the first [step] of the anti-SLAPP statute, we must focus on "the *specific nature of the speech* rather than the generalities that might be abstracted from it. . . ." ' [Citations." (*D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1216, quoting *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1570, original italics; see also *Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736.) Here, the specific nature of the speech was about falsified data and plagiarism in two scientific papers, not about global warming.[5]

Finally, Mahadevan argues this case is of public interest because research done at LBNL is publically funded; the assumption being that because Bikkina works at LBNL, his research is of public interest. This argument was rejected in *Rivero* because not every use of public funds constitutes a matter of public interest. (*Rivero*, *supra*, 105 Cal.App.4th at p. 925.) Additionally, Papers 1 and 2 were completed before Bikkina was employed at LBNL.

Although we conclude that the trial court correctly determined that Mahadevan did not satisfy his burden under the first prong of the anti-SLAPP statute, we choose also to address the potential merits of Bikkina's causes of action under the second prong.

### C. The Second Prong—Probability of Prevailing on the Claim

Even if Mahadevan could demonstrate that his statements arose from protected activity, shifting the burden to Bikkina, Bikkina demonstrated below that his claims have minimal merit to survive the motion to strike. To satisfy the second prong of the anti-SLAPP analysis, the plaintiff " ' " ' "must demonstrate the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment" ' " ' " if plaintiff's evidence is credited. (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 695, citing *Feldman v. 1100 Park Lane Associates* (2008) 160

---

[5] On December 1, 2014, appellant filed an unopposed request for judicial notice of multiple websites addressing research integrity and climate change. This court issued an order on December 17, 2014, stating that the request would be considered with the merits of the appeal. We deny the request, finding none of the materials to be relevant to the dispositive issues on appeal. (See Evid.Code, §§ 452, 459.)

13

Cal.App.4th 1467, 1477–1478.) "Thus, the only question for purposes of our review is whether, accepting [plaintiff's] evidence as true and only looking to defendants' evidence to assess whether it defeats [plaintiff's] as a matter of law, [plaintiff] established his causes of action against . . . defendant[] ha[s] minimal merit. [Citation.]" (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 275 (*Hawran*).)

Mahadevan raised five arguments as to why Bikkina did not carry his burden to demonstrate his claims have minimal merit: (1) Bikkina has failed to allege sufficient facts either in his complaint or in opposition to the motion to strike to state the claims asserted in his complaint; (2) Mahadevan's statements about Bikkina's research were, in fact, true; (3) the statements were privileged under Civil Code section 47, subdivisions (b), (c); (4) the applicable statute of limitations had expired before Bikkina brought suit; and (5) Bikkina cannot show actual malice.

**1. Bikkina's Opposition to the Motion to Strike Constituted Prima Facie Evidence Supporting the Claims Pleaded in His Complaint**

### *a. Defamation*

Bikkina pleaded two defamation causes of action in his complaint: libel per se and slander per se. "Defamation consists of, among other things, a false and unprivileged publication, which has a tendency to injure a party in its occupation. [Citations.]" (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 901.) "Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected. [Citation.]" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).)

Civil Code section 45 provides, "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Statements that "contain such a charge directly, and without the need for explanatory matter, are libelous per se. [Citation.]" (*McGarry*, *supra*, 154 Cal.App.4th at p. 112.) "To state a

14

defamation claim that survives a First Amendment challenge, . . . a plaintiff must present evidence of a statement of fact that is 'provably false.' [Citation.]" (*Nygard*, *supra*, 159 Cal.App.4th at p. 1048.)

Bikkina contends on appeal that his opposition to the motion demonstrated a prima facie case of libel and slander per se because Mahadevan's written and oral statements stated Bikkina had falsified and plagiarized data in his scientific papers. Bikkina submitted declarations from University faculty and administration as well as LBNL scientists, that Mahadevan made false statements to them. These statements are defamatory per se because they were damaging to Bikkina's professional reputation. The University provost's written decision concluded that Mahadevan "knowingly and in bad faith" made "false accusations against Mr. Bikkina regarding Paper #1 and Paper #2." She concluded that Bikkina had not committed plagiarism.

Mahadevan's evidence to the contrary was the declaration of Dr. Cornell, and four scholarly articles that were submitted as exhibits. As to Dr. Cornell's declaration, Mahadevan contends it supports his claims that Papers 1 and 2 were based on falsified data. Cornell's declaration, however, is far more limited. While Dr. Cornell stated that he once saw Bikkina using a sample of quartz crystal that appeared to be contaminated, he acknowledged that he did not know whether this contaminated sample formed the basis of Bikkina's research papers.

The first article Mahadevan submitted as an exhibit stated that the authors agreed with Mahadevan generally that surface contamination can lead to highly biased measurements, but they made no mention of Bikkina's papers. The second article stated that the authors did not observe the "hysteresis effect" reported by Bikkina. The third article mentioned Bikkina's research and stated that different results are presented in the literature from experiments under different conditions, making comparison difficult and necessitating more research. The final article stated, "The results reported by Bikkina (2011) in turn may be adversely affected by fluorine contamination on solid surfaces which raises question [*sic*] on the accuracy of the data." However, the article cited only to Mahadevan's comment on Bikkina's work as support for this statement.

Bikkina presented contrary evidence to show that his research was accurate, in addition to the University investigative findings. For example, in his declaration Bikkina contends that Mahadevan was wrong that the presence of fluorine constituted proof of contamination. He noted that even after Mahadevan raised his complaints about contamination of the data to the peer-reviewed journal that published Paper 1, the journal went forward with publication, demonstrating that it did not believe that Bikkina's research was faulty.

The parties' evidentiary showing as to the issue of truth as a defense was disputed, and cannot be resolved on defendants' section 425.16 special motion to strike. (*Taus*, *supra*, 40 Cal.4th at p. 714 [court does not weigh evidence or assess the credibility of the declarations in support of the anti-SLAPP motion].) Bikkina need only demonstrate a prima facie showing of facts to sustain a favorable judgment if his evidence is credited. (*Hawran*, *supra*, 209 Cal.App.4th at p. 293.) Accepting Bikkina's evidence as true, he has demonstrated his defamation claims have sufficient merit to survive a motion to strike.

### b. *Intentional Infliction of Emotional Distress*

The elements of a cause of action for intentional infliction of emotional distress are: " '(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress.' " (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946, disapproved on another point in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4.) Shame, humiliation, embarrassment, or anger can constitute emotional distress, but it must be severe and not trivial or transient. (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397.)

Bikkina has provided sufficient evidence to survive a motion to strike that his distress was severe and enduring. Bikkina's declaration stated that Mahadevan's "campaign" against him had brought great stress to himself and his family. It caused him to begin clenching his teeth to such a degree that he had broken two teeth requiring dental implants. He had ongoing stomach problems and chest pains requiring him to visit a

16

hospital. He was also suffering from insomnia. Bikkina was fearful that he would lose his job and concerned that Mahadevan would contact his new employer, Oklahoma State University. Mahadevan's "erratic" behavior also caused him and his wife to fear for their physical safety.

This showing is akin that that made in *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 477 where a claim of intentional infliction of emotional distress brought by a pastor who was accused by the defendant of drug dealing and child molestation in Internet posts survived an anti-SLAPP motion to strike. There was evidence in opposition to the motion that the comments "ruined" the reputations of the pastor and his wife and they feared for their physical safety such that they did not want to leave their residence, and even considered moving away so they could continue with a life of anonymity. (*Id.* at p. 487.) The court concluded the defendants' actions were more than mere insults, threats, or annoyances. (*Ibid.*)

This case is distinguishable from *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1376 (*Wong*), a case cited by Mahadevan. In *Wong*, the court found that a professional dispute which arose between the parents of a patient and the patient's dentist did not involve severe emotional distress. (*Id.* at p. 1377.) The plaintiff dentist had experienced loss of sleep, stomach upset and generalized anxiety. (*Ibid.*) The court held this minimal showing did not reflect severe or enduring emotional distress. (*Ibid.*)

"An anti-SLAPP-suit motion is not a vehicle for testing the strength of a plaintiff's case, or the ability of a plaintiff, so early in the proceedings, to produce evidence supporting each theory of damages asserted in connection with the plaintiff's claims. It is a vehicle for determining whether a plaintiff, through a showing of minimal merit, has stated and substantiated a legally sufficient claim. [Citations.]" (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 906.) Under this standard, Bikkina has made a sufficient prima facie showing of intentional infliction of emotional distress.

### c. Negligence

Civil Code section 1714 provides: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of

17

ordinary care or skill in the management of his or her property or person . . . ." (Civ. Code, § 1714.) "The mandate of this duty is to act with ordinary care and skill in the management of one's property and person. Breach of that duty occurs when a want of ordinary care in such management causes an injury. The result is liability, i.e., 'responsibility.' " (*Krupnick v. Hartford Accident & Indemnity Co.* (1994) 28 Cal.App.4th 185, 200.) In order to make a prima facie case for negligence, a plaintiff must demonstrate defendant owed him a duty. (*Rivera v. First DataBank, Inc.* (2010) 187 Cal.App.4th 709, 719.)

Bikkina alleges that Mahadevan failed to use ordinary care in engaging in the course of conduct set forth in the complaint. His negligence claim is based on the same conduct as the defamation claims: Mahadevan made false and malicious statements about him. As outlined above, Bikkina has presented a prima case showing of facts sufficient to support his allegations of defamation and intentional infliction of emotional distress. Mahadevan only addresses the negligence claim in one paragraph in his reply brief, without citing any evidence or legal authority. His sole argument is that his statements were true. As we have outlined above in detail, Bikkina has presented substantial evidence to the contrary. Moreover, "a finding of actual malice generally includes a finding of negligence, and evidence that is sufficient to support a finding of actual malice is usually, and perhaps invariably, sufficient also to support a finding of negligence." (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 279.)

Bikkina has stated a legally sufficient claim for both actual malice and negligence.

### d. Civil Code Section 47 Privileges

Mahadevan argues that the common interest privilege under Civil Code section 47, subdivision (c) applies. In his opening brief, however, he argues Civil Code section 47, subdivision (b) applies as well. We will address both privileges.

The defendant bears the burden of proving the privilege's applicability. (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 348–349.) Whether the privilege applies is a question of law. (*Hawran*, *supra*, 209 Cal.App.4th at p. 279.)

18

Civil Code section 47, subdivision (b) applies to a publication or broadcast made in legislative proceeding, judicial proceeding or other proceeding authorized by law. The privilege does not apply unless the statements were made in an anticipation of an official proceeding or during an official proceeding. (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 368.) Initially we note that there is no evidence the University's internal complaint process is either authorized by law or reviewable by mandate as required for application of the privilege as part of an official proceeding authorized by law. (See *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 368 (*Cruey*).)

But, even if were to assume that Mahadevan's statements made as part of the University complaint process to University personnel fall within the privilege,[6] his later statements to LBNL scientists and his allegation of plagiarism to Bikkina's non-University co-author would not fall within the privilege. (See *Hawran*, *supra*, 209 Cal.App.4th at p. 286.)

Civil Code section 47, subdivision (c) provides a conditional privilege for communications made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." (*Mann*, *supra*, 120 Cal.App.4th at p. 108.) The "interest" must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business, or similar relationship or the defendant is protecting his own pecuniary interest. (*Rancho La Costa, Inc. v. Superior Court* (1980) 106 Cal.App.3d 646, 664–665.)

Under Civil Code section 47, subdivision (c), defendant generally bears the initial burden of establishing that the statement in question was made on a privileged occasion,

---

[6] There is no evidence the University's internal complaint process was either authorized by law or reviewable by mandate as required for application of the privilege as part of an official proceeding authorized by law. (See *Cruey*, *supra*, 64 Cal.App.4th at p. 368.)

19

and thereafter the burden shifts to plaintiff to establish that the statement was made with malice. (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1202.) A plaintiff must show "actual malice" that the conduct was motivated by hatred or ill will. (*Taus*, *supra*, 40 Cal.4th at p. 722.)

Citing to unpublished federal authority, Mahadevan argues that scholarly communications among scientists fall within the common interest privilege. This privilege within the context of an academic debate was discussed by our Supreme Court in *Taus*. (*Taus*, *supra*, 40 Cal.4th at p. 720.) Plaintiff objected to a statement that she was engaged in destructive behavior followed by a reference to the fact she was currently in the military. (*Id.* at p. 702.) "[I]t is clear that the alleged defamatory statement here in question—a statement made by Loftus, a psychology professor and author, at a professional conference attended by other mental health professionals and that was related to the subject of the conference—falls within the reach of this statutory common-interest privilege. [Citations.]" (*Id.* at p. 721.)

Once again, even if the privilege applies here, Bikkina has made a prima facie showing Mahadevan acted with malice. " ' "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights (citations)." ' " (*Taus*, *supra*, 40 Cal.4th at p. 721, original italics.)

In *Hawran*, a genetic analysis company issued a press release that it had not used adequate protocols in its studies related to Down Syndrome, that it had accepted the resignation of the chief financial officer, Hawran, and was conducting an investigation into his actions. Hawran sued the company for defamation among other allegations and the company filed an anti-SLAPP motion to strike. (*Hawran*, *supra*, 209 Cal.App.4th at pp. 264-265.) The company alleged their press release was privileged under section 47 subdivision (c), but Hawran was able to demonstrate malice to defeat the privilege. (*Id.* at pp. 286-287.) In his declaration, he asserted that naming him in the press release was

20

motivated by his earlier actions in questioning the board and raising concerns. (*Id.* at p. 288.) "In view of the standard required for Hawran to meet his burden, and drawing all inferences in his favor, we conclude there is enough circumstantial evidence to support a prima facie case that malice motivated the statements made concerning Hawran in the September press release." (*Ibid.*)

Bikkina's declaration along with the declarations of the University provost and LBNL scientists support a conclusion that Mahadevan acted with ill will toward Bikkina or with reckless disregard of Bikkina's rights. Mahadevan's allegations against Bikkina were repeatedly found to be meritless by the University and yet he continued in his private campaign to discredit Bikkina's work. As outlined above, the provost's memorandum of decision documents that Mahadevan had disassociated himself from Bikkina's research and publications, yet he contacted a co-author to claim he had been plagiarized and made the same allegations to LBNL scientists. After the provost's original decision in 2011 that the allegations were untrue and merited sanctions against Mahadevan, he raised the same allegations with the University in 2012 and 2013. The provost described his conduct as "defamatory, retaliatory, demeaning, intimidating, threatening and otherwise harmful to Mr. Bikkina's educational and professional reputation on and off campus." She further concluded that Mahadevan had violated the University's ethical conduct policy by "making false allegations that were grounded in bad faith and with malicious intent to damage Mr. Bikkina's reputation, research and scholarship on and off campus." The provost further stated after Bikkina requested a new faculty advisor, Mahadevan threatened he would "screw [him]."

Therefore, even accepting that Mahadevan's statements at his presentation at LBNL were grounded in academic debate, his actions in reaching out to Bikkina's supervisor and LBNL's research and institutional integrity officer demonstrate malice. Bikkina's supervisor stated that he has "never had a scientist do this before." Similarly the University provost also stated that she could not "recall a single instance where any faculty persisted in attempting to re-argue the same allegations over and over again."

21

Bikkina has demonstrated actual malice sufficient to overcome the common interest privilege for his complaint to survive a motion to strike on the defamation claims.

### e. Statute of Limitations Defense

Mahadevan alleges, for the first time on appeal, that Bikkina's defamation claims are barred by the statute of limitations. He contends the statements made to University officials in 2011 and 2012 are time-barred.

"Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived. [Citations.]" (*Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11, fn. omitted.) A defendant appealing a special motion to strike, may not change his theory of the case for the first time on appeal. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 321, fn 10.)

Mahadevan argues that this court has discretion to consider his new defense because there are no facts in dispute. Citing to *Ward v. Taggart* (1959) 51 Cal.2d 736, 742, Mahadevan claims that where the facts necessary to decide a purely legal issue have been established, a party can advance the new issue on appeal. But here there are factual issues that were not developed before the trial court. For instance, Mahadevan alleges that his statements to the University were made in 2011 and 2012 and are barred by the statute of limitations, but there is contrary evidence in the record that he made a third complaint in April 2013. Further, Bikkina's complaint alleges: "All of the acts alleged herein were in the nature of a continuing and pervasive pattern of conduct" beginning in 2011 and continuing through September 2013. Bikkina's complaint was filed in March 2014. Given that the parties did not develop the factual record below to allow for a fair review of this nascent affirmative defense, we decline to exercise our discretion to review it now. Therefore, we deem Mahadevan's request that we review his statute of limitations defense forfeited by his failure to raise it before the trial court.

### IV.

### DISPOSITION

The judgment of the trial court denying Mahadevan's special motion to strike is affirmed. Costs on appeal are awarded to Bikkina.

22

_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
RIVERA, J.


23

A143031, *Bikkina v. Mahadevan*

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. John M. True III |
| Counsel for Appellant: | Law Offices of Carleton L. Briggs, Carleton L. Briggs |
| Counsel for Respondent: | Law Offices of Edward C. Casey Jr., Edward C. Casey Jr. |

A143031, *Bikkina v. Mahadevan*