Filed 7/11/16  Boswell v. The Retreat Community Assn. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| DAVID W. BOSWELL et al., | |
| Cross-Complainants and Respondents, | E064171 |
| v. | (Super.Ct.No. RIC1501114) |
| THE RETREAT COMMUNITY ASSOCIATION et al., | OPINION |
| Cross-Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Craig Riemer, Judge.

Affirmed in part, reversed in part, and remanded with directions.

Parlow Law Office and Daniel M. Parlow for Cross-Defendants and Appellants.

Law Offices of Jason D. Annigian and Jason D. Annigian; Girardi and Keese and

Andre Rekte for Cross-Complainants and Respondents.

In 2011, David and Melina Boswell moved into a gated community in Corona

called the Retreat.  The Retreat Community Association (Association) is the homeowners

association for the Retreat.  Carl S. Schmidt is the President of the Association.

1

Almost from the beginning, there was friction between the Boswells, on one hand, and the Association and Schmidt on the other. Were the Boswells repeatedly violating the Association's rules? Or was the Association repeatedly bringing groundless and harassing enforcement proceedings against the Boswells? Tensions escalated after the Association and Schmidt discovered that a putative class action for fraud had been filed against the Boswells and their business, and again after Boswell created a Facebook page entitled, "What's Happening in the Retreat?," which the Association and Schmidt considered defamatory.

Finally, in 2015, the Association filed this action against the Boswells and others, seeking to enjoin the Boswells from using their property at the Retreat in connection with the fraud alleged in the class action, and also seeking to enjoin the Boswells from using the Retreat's trademark on Facebook.

The Boswells cross-complained against the Association — and against Schmidt — for intentional and negligent infliction of emotional distress and for declaratory relief regarding the Boswells' membership rights in the Association.

The Association and Schmidt filed a special motion to strike the Boswells' cross-complaint under Code of Civil Procedure section 425.16 (anti-SLAPP motion). In opposition, the Boswells submitted declarations describing a laundry list of some 19 instances in which the Association and Schmidt had assertedly inflicted emotional distress on them.

The trial court denied the anti-SLAPP motion on the ground that the Boswells' causes of action did not arise out of protected activity. It specifically ruled that, in making this determination, it could consider only the cross-complaint, and it could not consider the Boswells' declarations.

In this appeal, the Association and Schmidt (collectively appellants) argue that the trial court erred in ruling that the Boswells' declarations were not relevant to whether their causes of action arose out of protected activity. They further contend that, once the Boswells' declarations are considered, they reveal that the emotional distress causes of action arise out of at least 14 instances of protected activity. Finally, they contend that the Boswells did not show a probability that they would prevail on the emotional distress causes of action.[1]

We will hold that, to determine whether the emotional distress causes of action arise out of protected activity, we are required to consider the Boswells' declarations. Once those declarations are considered, it becomes apparent that the emotional distress causes of action do arise out of protected activity by the Association and Schmidt. Specifically, the Boswells' claims are based, at least in part, on (1) appellants' communications to members of the Association and others about the putative class action against the Boswells, which was speech "in connection with an issue under consideration or review by a . . . judicial body" (Code Civ. Proc., § 425.16, subd. (e)(2)); and/or (2)

---

[1] Appellants now concede that the declaratory relief cause of action did not arise from protected activity.

appellants' communications to members of the Association and others asserting that the Boswells' Facebook page was harming the Retreat and that the Boswells were operating a fraudulent business on the Retreat's premises, which was speech "in connection with a public issue or an issue of public interest" (Code Civ. Proc., § 425.16, subd. (e)(4)).

Finally, we will hold that the Boswells did make the necessary minimal showing that they would prevail on their cause of action for intentional infliction of emotional distress; however, they did not did make the necessary minimal showing that they would prevail on their cause of action for negligent infliction of emotional distress. Accordingly, we will affirm in part and reverse in part.

I

FACTUAL BACKGROUND

The following facts are taken from the declarations filed by both sides in connection with the anti-SLAPP motion.

A.    *Background.*

The Association is the homeowners association for a common interest development of 521 single-family homes in Corona known as the Retreat. Schmidt is the President of the Association. Schmidt is also the head of the Association's Architectural Committee.

In 2011, the Boswells moved into a house in the Retreat.[2]  The Boswells own and operate a company called New Wealth Advisors Club (NWAC).

B.      *The Factual Basis of the Boswells' Claims.*

In their declarations, the Boswells identified the following 19 incidents as the basis of their claims for intentional and negligent infliction of emotional distress.

1.      *The flagpole incident.*

The Boswells installed a flagpole and began flying an American flag.  The Association directed them to take the flagpole down because it had not been approved by the Architectural Committee.  Schmidt is the head of the Architectural Committee.  The Boswells refused, citing Civil Code section 4705, which provides that a common interest development cannot prohibit the display of an American flag.  They did not receive a response.

2.      *The garage door replacement incident.*

The Boswells replaced their garage doors, one of which had broken, at a cost of $6,000.  The new doors were the same as on the Association's website and on nine other homes in the Retreat.  The Association ordered the Boswells to take them down because they had not been approved by the Architectural Committee.

_____

[2]      Both sides describe the Boswells as "residents" rather than owners.  Certain anonymous communications attributed to Schmidt disparaged them as "renters."  In the cross-complaint, however, the Boswells allege that they are purchasing the home through a land sale contract.

The Boswells then applied for approval of the new doors. At first, the Association denied the application on the ground that it was not made until after the doors had already been installed. Under the Association's governing documents, this was not a valid reason for disapproval. When the Boswells protested, the Association tentatively approved the application, subject to an inspection to determine whether the new doors were energy-efficient. Energy efficiency also was not a valid reason for disapproval. The Boswells refused to allow an inspection. The Association then accepted the doors.

3. *The towing incident.*

In May 2014, Schmidt instructed security guards to tow away a car that belonged to a guest of the Boswells and that was parked in front of their house. The guards later claimed that it did not have a visibly displayed parking pass. Actually, it had been issued a parking pass when it entered. Moreover, the guards had taken down the car's license plate number and could have verified that it belonged to a visitor.

The guest filed a small claims action against the Association. At the hearing, Schmidt appeared as the representative of the Association. He brought records which indicated — falsely — that the guest had not been issued a parking pass.

Schmidt also brought a binder full of information about the Boswells and NWAC, including a list of all the people who came to their house. He said it was "to prove to the court [that Boswell] was a bad guy." He tried to give the file to the judge, but the judge refused to take it. Schmidt told the judge that Boswell was "a repeat offender" and that "it was necessary to teach [him] the rules."

6

The judge ruled for the Association. In the hallway after the hearing, Schmidt approached Boswell and "whispered in a very snide way with a smirk on his face, 'If you don't like it, you can always move.'"

4. *The "operating a business" incident.*

In June 2014, the Association cited the Boswells for operating a business out of their home. Boswell appeared at a hearing chaired by Schmidt. Schmidt produced a photo, from NWAC's Instagram account, showing students in the Boswells' backyard, with the caption, "[A]fter a day of coaching and training in the field." Boswell explained that he had been out working with the students all day and had then brought them back to his house for a social dinner. Schmidt "wouldn't listen." Schmidt then said that neighbors had been complaining about noise and traffic. Boswell asked Schmidt to produce the complaints, but Schmidt said the neighbors were too "scared."

The Association imposed a $50 fine. The Boswells did not pay it, and the Association took no action to collect it.

5. *The driveway replacement incident.*

The Boswells' driveway was cracking because it had not been installed correctly. They arranged to have it removed and a new one installed in August 2014, while they were out of the country on vacation. They did not think they needed the Association's approval, because the new driveway was going to be the same material, the same design, and the same color.

The Association took the position that replacement of the driveway did require its approval. It sent the Boswells a cease and desist letter. It also had security guards tell the construction workers to leave immediately or they would be arrested for trespassing. Thereafter, it refused to let construction workers come in through the security gate. The Boswells had to deal with all of this while they were out of the country.

The Boswells applied for approval of the new driveway. The Association refused to act on the application until its next monthly meeting, even though this meant that the construction was left in an unfinished state; Boswell could not even drive his car, as it had been left in the garage. Ultimately, the Association approved the application.

6.      *The drive-by incidents.*

Because he was concerned about Schmidt's behavior, Boswell installed a security video system at his home. The videos revealed Schmidt "driving by [the Boswells'] house slowly or stopping in front of it and taking pictures."

According to Schmidt, as head of the Architectural Committee, he drives by every house in the Retreat at least once a month. He "document[s] potential violations of Association rules" (presumably by taking photos).

7.      *The anonymous "meet-and-greet" flyer.*

The Boswells invited 35 neighboring families to a "meet-and-greet" at their house, scheduled for January 11, 2015. "The purpose of the meet-and-greet was to bring neighbors together and create a sense of community."

8

In the early morning hours of January 11, an anonymous flyer was left at every house in the neighborhood except the Boswells'. It stated:[3]

"It has come to our attention that a renter has organized a meeting regarding security status this Sunday. This tenant is not entitled to receive any security or other homeowner data regarding the community. Their actions are designed to incite fear in the homeowners, by those who have no financial interest in the community.

"Organizers have mentioned lawsuits, without acknowledging they are the ones suing the Association.[4] Lawsuits from renters like these cost you, the homeowner, by taking money from your HOA."

        8.     *The anonymous "threats and defamation" email*.

Boswell created a Facebook page concerning the Retreat, entitled, "What's Happening in the Retreat?" On January 18 and 19, 2015, Schmidt

sent the following email anonymously to all members of the Association:[5]

---

      **3**     In this and all subsequent quotations, spelling and punctuation are as in the original, except as indicated by brackets.

      **4**     It is not clear what "lawsuits" this refers to; this action had not yet been filed and, in any event, it began as an action by the Association against the Boswells, not vice versa.

      **5**     Boswell's declaration purported to quote the email, as well as to attach a copy. The attached copy included the first quoted paragraph, but not the second quoted paragraph. Accordingly, we take the first paragraph from the attachment but the second paragraph from Boswell's declaration, while omitting italics, underscoring, and "*sic,*" which Boswell admittedly added to the original.

9

"You may know that there's a Facebook page defaming the Retreat, the Association and the Board under the disguise its for the community. Because the board members are homeowner too, have families here and are true faith based people I feel it's my obligation to defined all of the above for that greater good of all. Although some of these perpetrators have been at this for a few years it has escalated. Threats and defamation is their trademark. I'm going to set the record straight. **If you Truly don't want to know the facts (Truth), and or your Not a Homeowner (the impacted) You should stop reading this**. Otherwise here they are to all their false allegations. **If you have questions ask.** Knowledge and the Truth are powerful antidotes.

"Simply put, their FB page contains Nemours members who are a combination of People who don't live here, renters who don't own here, Boswell employees, etc.; By nature if you have No financial interest in the success of the Retreat you care less about what happens to it. Boswell himself is not an owner. Dissimulating and Distributing confidential information of a private nature to the public via the internet is a potential crime. It's also unethical."

9. *The anonymous "claims to be a Christian" email.*

On January 21, 2015, Schmidt sent the following email anonymously to all members of the Association:

10

"If you our one's that can see the latest post from Todd Dean[6] over the internet on a site where more than half are non-members two things are revealed. I can't based on ethics or morals resend it if you haven't seen it.

"1st - This site was NEVER about Community Unity rather about posting this content. (I feel very sorry for those who thought otherwise.)

"2nd – Since more than half the pages content aren't homeowner/members or even live here your Community Your Home Values have just been Severely Damaged.

"Something to think about when accepting an invitation to his Feb 13th party at his home. You either spread hate, Indorse it, Condone it or Reject it. Your choice. The page creator claims to be a Christian. Wow . . . If your silent on this everyone knows your answer."

10. *The camera incident*.

On January 21, 2015, Boswell found Schmidt parked outside his house with either a camera or a video camera.

11. *Helping to subpoena the Association*.

At some point, individuals represented by Attorney Geralyn Skapik filed a putative class action against NWAC (*Anderson v. NWAC*).[7]

---

**6** Todd Dean was the former owner of the Boswells' house. He remained a member of the Association (presumably because he was selling the house to the Boswells under a land sale contract). Perhaps most important, he co-created the Boswells' Facebook page.

On January 22, 2015, Attorney Skapik issued a subpoena to the Association in connection with *Anderson v. NWAC*. In it, she sought items that only someone familiar with the Retreat would know about, such as information from its "GateKey" system. The Boswells conclude that Schmidt gave her the information that she needed to prepare the subpoena.

12. *The anonymous postings on www.complaintboard.com.*

On January 23, 2015, Schmidt posted anonymously on www.complaintboard.com:

"Ripoff

"There's now a class action lawsuit against New Wealth Advisers Club (Riverside CA) to help recoup money. Contact the attorney Skapik at [telephone number]."

On January 25, 2015, Schmidt posted anonymously on www.complaintboard.com:

"New Wealth Advisers Club has a class action lawsuit against them. [Case number.] Contact Skapik Law @ [telephone number]."

13. *The posting of the complaint on Facebook.*

On January 29, 2015, the Association filed the original complaint in this case. On January 31, 2015, Schmidt posted a copy of the complaint on a Facebook page he operates called "The Retreat Residents."

---

**7** Appellants asked the trial court to take judicial notice of the complaint in *Anderson v. NWAC*. However, they have not included it in the appellate record and have not asked us to take judicial notice of it.

12

One resident of the Retreat posted a response asking for more information. Schmidt replied:

"I will by Friday. I've been tied up on business. All I can say is the attorities, legal and others are involved. The associations being subponiaed about activitie of Boswell. Not good."

14.    *The posting of the complaint on a bulletin board*.

On or before February 6, 2015, the Association put the complaint in *Anderson v. NWAC* as well as the complaint in this case on display on a locked community bulletin board. The complaints remained posted for nearly two months. Although the Association had been involved in other lawsuits, it had never similarly posted any other complaints.

15.    *The letter to real estate brokers*.

In April 2015, Schmidt sent a letter anonymously to local real estate brokers stating:

"The Retreat is one of the premier communities within the region unmatched in prestige and value. Recently its reputation has been tarnished as the result of a social media campaign involving a house flipping business called New Wealth Advisers Club using the Retreat to attract potential customers and students. The community has fought back by taking necessary steps to exonerate itself from liability. This is not enough for those who make a living selling real estate in this region."

13

It listed certain brokers who were "a party to their social media membership," and it implied that persons who were "considering buying or selling a home in this community" should not deal with them.

16.    *The anonymous "marketing scam" email*.

In May 2015, the Boswells once again invited neighbors to a "meet-and-greet" at their home.  On May 7, 2015, Schmidt sent the following email anonymously to some or all of the members of the Association:

"You may have received an invitation to a meeting from non members Dave & Melina Boswell.  Please be aware the . . . Association that you belong to has been subject to multiple litagation suites with the Boswells including one pertaining to an alleged multilevel real estate marketing scam known as New Wealth Advisers Club operating in part from our community.

"Notice of the recent suit was sent to members a couple months ago.  We are also being pursued for discovery in a separate class action lawsuit filed against these same individuals.  You can find more on NWAC via the internet pertaining to this.  Please log on to the official Retreat members website for information on your community and attend meetings for factual information on the Retreat."

17.    *The second posting on Facebook*.

On May 8, 2015, Schmidt posted on "The Retreat Residents" Facebook page:

"There is apparently a new website using the Boswell's photo as their poster. . . . Some of these websites mention the Retreat as their (Boswell's) base of business.

PLEASE let me know if you see or hear anything. We now have many visitors from Nouveau Riche Corporation which was the former base of operations. Please help the board protect our community."

The post was accompanied by a photo of the Boswells taken from a website called whoscammedyou.com and labeled as such.

18. *Telling other homeowners that the Boswells were "run[ning] a scam."*

On May 14, 2015, at a homeowners association meeting, in front of some 75 to 85 people, one resident said that the Boswells were "run[ning] a scam and that the neighborhood and their children aren't safe with us living there." She said she had gotten this information from Schmidt.

19. *The "scam artist" flyer.*

On May 20, 2015, Schmidt mailed an flyer anonymously to members of the Association which included a description of *Anderson v. NWAC*, the first page of the complaint from *Anderson v. NWAC*, and criticism of NWAC taken from the internet. It also referred to the Boswells as "SCAM ARTIST[S]."

C. *The Boswells' Recall Campaign.*

At some point after the Association filed the present action, the Boswells led a campaign to have Schmidt either resign or be recalled. They and other like-minded individuals picketed at the front gate, handed out flyers, and circulated petitions. They

accused Schmidt and the other board members of "embezzlement and filing too many lawsuits."

## II

## PROCEDURAL BACKGROUND

A. *The Association's Complaint*.

On January 29, 2015, the Association commenced this action by filing a complaint against the Boswells, NWAC, and others. In its complaint, the Association noted that, in *Anderson v. NWAC*, the Boswells had been accused of "carry[ing] out a fraudulent real estate seminar/multi-level marketing scheme . . . ." It expressed concern that, by carrying on the business of NWAC at their home at the Retreat, the Boswells had exposed the Association to potential liability.

The Association sought a declaration that it was not liable for the Boswells' "alleged fraudulent acts and/or omissions." It also sought an injunction against the use of the Boswells' property "for illegal purposes." Finally, it sought to prevent the Boswells from using the Retreat's trademark on Facebook.

B. *The Boswells' Cross-Complaint*.

On March 30, 2015, the Boswells filed a cross-complaint against the Association and also against Schmidt.

According to the general allegations of the cross-complaint, Schmidt had "targeted [the Boswells] for unjustifiable, specious and punitive action so as to punish, harass and embarrass them all under the color and authority as an officer of the [Association]." He

16

had "harassed, stalked, and threatened" them. He had also "undertaken a course of action to interfere with [their] business and business opportunities."

The cross-complaint continued: "Schmidt has accused [the Boswells] of violating rules of [the Association] and publicly stated that they are operating [a business] out of their home. Schmidt has set a hearing and issued a fine on this issue for the sole purpose of harassing [the Boswells]. Schmidt has collected data, researched and scoured the Internet regarding [the Boswells]. . . . Schmidt . . . advised Boswell that if he did not like his behavior to him he 'could move.'" (Capitalization altered.)

Based on these general allegations, the cross-complaint asserted causes of action for intentional and negligent infliction of emotional distress.

The cross-complaint also asserted a cause of action for declaratory (and injunctive) relief, solely against the Association, alleging that the Association had refused to recognize the Boswells as members and had refused to allow them to vote and to attend meetings.

C.      *Appellants' Anti-SLAPP Motion.*

Appellants filed an anti-SLAPP motion. The Boswells filed an opposition, including their own declarations. The trial court denied the motion, ruling that appellants had failed to show that the Boswells' causes of action arose from protected activity.

The trial court expressed the view that, in deciding whether the Boswells' causes of action arose from protected activity, it was limited to the four corners of the complaint: "[I]t seems to me, in evaluating the showing under prong 1 of an anti-SLAPP motion,

17

you don't look at declarations, . . . you look at the complaint against which the motion is posed and you see what are alleged there. . . ."

Thereafter, the Boswells filed an amended cross-complaint.[8]  The Association then dismissed its complaint, without prejudice, leaving the Boswells' amended cross-complaint as the only operative pleading.

III

THE ANTI-SLAPP STATUTE

The anti-SLAPP statute, Code of Civil Procedure section 425.16, subdivision (b)(1), as relevant here, provides:  "'A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.'  The analysis of an anti-SLAPP motion thus involves two steps.  'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity.  [Citation.]  If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of

---

   [8]    Assuming that the trial court should have granted the anti-SLAPP motion, then it should not have allowed the Boswells to amend.  (*Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073-1074.)  Accordingly, the amended complaint does not moot the appeal.  (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 460-462; cf. *JKC3H8 v. Colton* (2013) 221 Cal.App.4th 468, 478-479.)

prevailing on the claim.' [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820.)

"We review an order granting or denying a motion to strike under section 425.16 de novo. [Citation.]" (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 820.)

## A. *"Arising From" Prong*.

Appellants contend that the trial court erred in ruling that, in deciding whether the Boswells' causes of actions arose from protected activity, it was not required to consider the declarations. They further contend that the Boswells' emotional distress claims do arise from protected activity, and the trial court erred by ruling to the contrary.

### 1. *Consideration of the declarations*.

Assuming the trial court did err by refusing to consider the declarations, that error would not be reversible in itself. As noted, we review its ruling de novo. Accordingly, we would consider the declarations, as well as the complaint, and we would decide independently whether the claims arise from protected activity. If they do, then the trial court committed reversible error by ruling otherwise. If they do not, then the trial court's error in refusing to consider the declarations was harmless. Nevertheless, we must reach this issue to decide whether *we* can and should consider the declarations.

As mentioned, Code of Civil Procedure section 425.16, subdivision (b)(1) lays out both prongs of the anti-SLAPP test. Code of Civil Procedure section 425.16, subdivision (b)(2) then provides: "In making its determination, the court shall consider the pleadings,

19

and supporting and opposing affidavits stating the facts upon which the liability or defense is based." "Its determination" necessarily refers back to both prongs.

The trial court focused instead on the words, "the facts upon which the liability or defense is based." It explained: "[W]hen you look at the language . . . that says you can look at declarations, you can look at matters of judicial notice and all of that, subdivision (b)(2), it talks about relying on those items to determine, quote, 'the facts upon which the liability or defense is based.' In my mind, that's clearly talking about the second prong. It seems to me for the first prong, we don't look at any of that stuff. We look at the pleading alone." However, the statute does not actually say that the trial court is to use the affidavits to "determine . . . 'the facts . . . .'" Rather, it says that, "[i]n making its determination, the [trial] court" is to "consider the . . . affidavits stating the facts . . . ." And, again, "its determination" refers back to the entire two-prong test.

As appellants point out, the Supreme Court has stated that: "In deciding whether the initial 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' ([Code Civ. Proc.,] § 425.16, subd. (b).)" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) Moreover, in the same case, it did, in fact, consider the declarations in deciding whether the "arising from" requirement had been met. (*Id*. at pp. 89-90; accord, *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79-80.) Finally, a standard treatise states that, in ruling on the first prong of the anti-SLAPP analysis, "the court considers the pleadings, declarations and matters that may be judicially noticed. [Citations.]" (1 Weil & Brown,

Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2015) ¶ 7:992, p. 7(11)-55.)

Thus, we conclude that the trial court erred by ruling that it was not required to consider the declarations in ruling on the first prong of the analysis.

2. *Appellants' conduct included protected activity.*

Protected activity "includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e).)

"'In assessing whether a cause of action arises from protected activity, "'we disregard the labeling of the claim [citation] and instead "examine the *principal thrust or gravamen* of a plaintiff's cause of action . . ."' . . . . We assess the principal thrust by identifying "[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim." [Citation.] If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the

21

anti-SLAPP statute. [Citation.]' [Citation]." [Citation.] "[T]he critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech."' [Citation.]" (*Collier v. Harris* (2015) 240 Cal.App.4th 41, 50.)

The 19 emotionally distressing incidents listed in the Boswells' declarations can be organized into categories and analyzed as such.

First — especially in the earliest stages of the dispute — the alleged injury-producing conduct consisted of efforts to enforce the Association's rules against the Boswells, albeit groundlessly, maliciously, and/or harassingly. This would include: (1) the flagpole incident; (2) the garage door replacement incident; (3) the "operating a business" incident; and (4) the driveway replacement incident. These were garden-variety, private homeowners association disputes; they do not involve any protected activity by appellants. (See *Turner v. Vista Pointe Ridge Homeowners Assn.* (2009) 180 Cal.App.4th 676, 687-688 [homeowners association's demands that homeowners comply with CC&R's were not protected activity].)[9]

Second, some of the alleged injury-producing conduct consisted of surveillance, or as the Boswells put it, "stalking." This would include: (1) during the towing incident,

---

[9] Like these incidents, the towing incident had some aspects of a garden-variety homeowners association dispute. However, it also had some aspects that arguably could be deemed protected activity — namely, appellants' conduct in defense of the small claims action, and their assembly of a dossier on the Boswells. Thus, it spills over into several categories. We will discuss these other aspects of the towing incident below.

22

assembling a dossier on the Boswells; (2) the drive-by incidents (which included taking photos); and (3) the camera incident. We recognize that photography can be constitutionally protected speech. (*Regan v. Time, Inc.* (1984) 468 U.S. 641, 648-649; *Joseph Burstyn, Inc. v. Wilson* (1952) 343 U.S. 495, 502.) However, Code of Civil Procedure "'section 425.16 does not apply in every case where the defendant may be able to raise a First Amendment defense to a cause of action. Rather, it is limited to exposing and dismissing SLAPP suits — lawsuits "brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" "*in connection with a public issue*." [Citations.]' [Citation.]" (*Public Employees' Retirement System v. Moody's Investors Service, Inc.* (2014) 226 Cal.App.4th 643, 677-678, italics added, italics omitted, fn. omitted.) Schmidt's alleged photography does not appear related to any public issue. Likewise, his assembling a dossier on the Boswells was not protected activity; although he did allegedly try to introduce it in the small claims action, it was irrelevant to that action and the judge refused to consider it. (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 866 [harassing investigation that extended far beyond the scope of the issues subject to arbitration was not protected activity].)

Third — especially in the later stages of the dispute — some of the alleged injury-producing conduct consisted of speech. This includes (1) the anonymous "meet-and-greet" flyer, (2) the anonymous "threats and defamation" email, (3) the anonymous "claims to be a Christian" email, (4) the letter to real estate brokers, (5) the anonymous "marketing scam" email, (6) the second posting on Facebook, (7) telling other

23

homeowners that the Boswells were "run[ning] a scam." Appellants' overall themes were that the Boswells did not have the Retreat's interests at heart because they were renters, not owners; thus, they were harming the Retreat by spreading falsehoods about it on their Facebook page and by operating a fraudulent business on the Retreat's premises.

These matters were likely to be of interest to other homeowners in the Retreat. The Boswells argue, however, that this speech was not in connection with "a public issue" or "an issue of public interest." (See Code Civ. Proc., § 425.16, subds. (e)(3), (e)(4).) "[I]n order to satisfy the public issue/issue of public interest requirement of [Code of Civil Procedure] section 425.16, subdivision (e)(3) and (4) . . . , in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging participation in matters of public significance." (*Du Charme v. International Broth. of Elec. Workers, Local 45* (2003) 110 Cal.App.4th 107, 119, italics omitted, fn. omitted; accord, *Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP* (2007) 146 Cal.App.4th 841, 846-849; but see *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 381 & 381, fn. 15.)

Appellants argue that their speech did relate to an ongoing controversy, citing two cases involving homeowners associations: *Ruiz v. Harbor View Community Assn.* (2005)

134 Cal.App.4th 1456 and *Cabrera v. Alam* (2011) 197 Cal.App.4th 1077.  We will take these in turn.

In *Ruiz*, the architectural committee of a homeowners association denied a husband and wife's request for approval of their plans to build a new house.  (*Ruiz v. Harbor View Community Assn.*, *supra*, 134 Cal.App.4th at p. 1462.)  Thereafter, the husband accused the committee of making arbitrary and capricious decisions, of failing to apply its guidelines consistently, and of applying its own subjective preferences.  (*Id*. at p. 1463.)  He made various requests for information and documents.  (*Ibid*.)  In response, the attorney for the association wrote two letters that the husband claimed were defamatory; in addition to addressing the husband's charges against the association, he accused the husband of "reprehensible conduct" at an association board meeting (*id*. at pp. 1463-1464) and of "harassing" and "virtually stalking" the directors at association board meetings (*id*. at pp. 1464-1465).

The appellate court held that the attorney's statements concerned an issue of public interest.  (*Ruiz v. Harbor View Community Assn.*, *supra*, 134 Cal.App.4th at pp. 1468-1470.)  "Plaintiffs and [the association] were involved in ongoing disputes over approval of Plaintiffs' . . . plans, the application of [the association]'s architectural guidelines, and Plaintiffs' demands for information and documents.  Those disputes were of interest to a definable portion of the public, namely, the members of [the association], because they would be affected by the outcome of those disputes and would have a stake in [association] governance.  [The husband's] conduct at [the association] board meetings

25

and interaction with board members affected [the association] governance and therefore would also be of interest to community members." (*Id*. at p. 1468.)

In *Cabrera*, the defendant was running for reelection to the board of a homeowners association; the plaintiff, a former president of the association, opposed the defendant's reelection. (*Cabrera v. Alam*, *supra*, 197 Cal.App.4th at pp. 1081, 1083.) At the association's annual meeting, the plaintiff accused the defendant of mismanaging the association's finances. (*Id*. at p. 1084.) The defendant retorted by accusing the plaintiff of misappropriating $100 from the association. (*Id*. at pp. 1084-1085.) The plaintiff then sued the defendant for defamation. (*Id*. at p. 1081.)

The appellate court held that the defendant's statements did relate to an issue of public interest because, by attacking the plaintiff's credibility, they tended to refute the *plaintiff's* charges against the *defendant*. (*Cabrera v. Alam*, *supra*, 197 Cal.App.4th at pp. 1089-1090.) Thus, "they were connected to [the defendant's] qualification for reelection to the association's board of directors." (*Id*. at p. 1088.) In addition, "[t]he statements were made directly in response to plaintiff's charges of financial mismanagement by defendant and in the context of plaintiff's and defendant's public debate at the annual homeowners' election meeting." (*Id*. at p. 1091.)

Here, Schmidt's declaration showed that there was an ongoing controversy — spearheaded by Boswell — over whether Schmidt should resign or be recalled. Boswell had accused Schmidt of embezzlement and filing too many lawsuits. Thus, under *Ruiz* and *Cabrera*, when Schmidt retorted by accusing Boswell of filing lawsuits against the

26

Association, making false allegations on Facebook, revealing confidential information, and running a scam, his statements did not relate solely to a personal matter between him and Boswell; rather they related to an underlying issue of public interest.

The Boswells attempt to distinguish *Cabrera* on the ground that "the Boswells are not candidates for a position on the board of the homeowners association." However, that is precisely why *Cabrera* is on point — there, too, the plaintiff was not a candidate; rather, the defendant was a candidate. Nevertheless, *the defendant's* comments accusing *the plaintiff* related to an issue of public interest. Similarly, in *Ruiz,* the attorney's letter accusing the plaintiff of "reprehensible conduct" and "stalking" related to the plaintiff's own underlying claims of maladministration by the association.

The Boswells also attempt to distinguish *Cabrera* on the ground that "none of [appellants'] conduct . . . occurred at a homeowners' association meeting or similar public forum . . . ." However, appellants' flyers, emails, and Facebook postings were aimed at the entire Retreat community. Similarly, the letter to the real estate brokers was broadly aimed at the local real estate community. To put it another way, because the 500-some-odd members of the Association constituted a "definable portion of the public" (see *Du Charme v. International Broth. of Elec. Workers, Local 45*, *supra*, 110 Cal.App.4th at p. 119), communications broadcast to them were made in a public forum.

Additionally, the Boswells argue that appellants cannot claim that the anonymous communications were in furtherance of *their* right of petition or free speech (Code Civ. Proc., § 425.16, subd. (b)(1)), precisely because they were anonymous. This argument is

27

frivolous. For purposes of the first prong of the anti-SLAPP analysis, the question is not what the defendants did, it is what the plaintiffs accuse them of doing. And here, the Boswells expressly accuse appellants of authoring the anonymous communications. Thus, this is an action "arising from" communications allegedly made by appellants, even if it turns out that they never actually made them.

Fourth and finally, some of the alleged injury-producing conduct concerned *Anderson v. NWAC*. These included: (1) helping to subpoena the Association, (2) the anonymous postings on www.complaintboard.com; (3) the posting of the complaint in *Anderson v. NWAC* on Facebook; (4) the posting of the complaint in *Anderson v. NWAC* on a community bulletin board; (5) the anonymous "marketing scam" email, which described *Anderson v. NWAC*; and (6) the "scam artist" flyer, which also described *Anderson v. NWAC*.

These all constituted communications "in connection with an issue under consideration or review by a . . . judicial body . . . ." (Code Civ. Proc., § 425.16, subd. (e)(2); see *Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043, 1055 ["litigation update" email was protected activity]; see also *Mallard v. Progressive Choice Ins. Co.* (2010) 188 Cal.App.4th 531, 538-542 [issuance of subpoena in connection with official proceeding authorized by law was protected activity].) "[S]tatements, writings, and pleadings in connection with civil litigation or in contemplation of civil litigation are covered by the anti-SLAPP statute, and that statute

28

does not require any showing that the litigated matter concerns a matter of public interest. [Citation.]" (*Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 472.)[10]

In sum, then, the Boswells' emotional distress causes of action arise partly out of protected activity and partly out of unprotected activity. "'[W]here a cause of action alleges both protected and unprotected activity, the cause of action will be subject to section 425.16 unless the protected conduct is "merely incidental" to the unprotected conduct.' [Citations.] As one court explained, 'if the allegations of protected activity are only incidental to a cause of action based essentially on nonprotected activity, the mere mention of the protected activity does not subject the cause of action to an anti-SLAPP motion. [Citation.]' [Citation.] But if the allegations concerning protected activity are more than 'merely incidental' or 'collateral,' the cause of action is subject to a motion to strike. [Citations.]" (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672; accord, *M.F. Farming, Co. v. Couch Distributing Co.* (2012) 207 Cal.App.4th 180, 197.)

"'A mixed cause of action is subject to section 425.16 if at least one of the underlying acts is protected conduct, unless the allegations of protected conduct are merely incidental to the unprotected activity.' [Citation.]" (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 946, fn. omitted; accord, *Salma v. Capon* (2008) 161 Cal.App.4th 1275,

---

**10** As mentioned in footnote 9, *ante*, in the towing incident, appellants' communications about issues under consideration in the small claims action also fall into this category.

29

1287.)  This is consistent with "the fundamental concept that a 'plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of "one cause of action."'  [Citation.]" (*Comstock v. Aber*, *supra*, at p. 946.)

In *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, paragraph 31 of the complaint alleged 16 separate breaches of fiduciary duty (assigned letters (a) through (p)).  (*Id*. at p. 1544.)  Certain defendants filed an anti-SLAPP motion, arguing that two of the alleged breaches (paragraphs 31(o) and 31(p)) involved protected activity.  (*Id*. at pp. 1545-1546.)

The appellate court held that the entire cause of action arose from protected activity because paragraphs 31(o) and 31(p) did allege protected activity (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures*, *supra*, 184 Cal.App.4th at pp. 1548-1550) and were not merely incidental (*id*. at pp. 1550-1553):  "Because each of the subparagraphs of paragraph 31 purports to identify a breach of . . . fiduciary duties, subparagraphs (o) and (p) could each be the sole and adequate basis for liability under the cause of action, even if [the plaintiff] could not prove any of the other subparagraphs. [Citation.]

"If paragraphs 31(o) and 31(p) had been the only acts alleged in the third cause of action, the cause of action would certainly be subject to the SLAPP statute, under the theory that premising liability on those acts would chill the exercise of free speech and petition.  On the other hand, the pleading of other, indeed numerous other, indisputably,

30

'unprotected' theories of liability does not eliminate or reduce the chilling effect on the exercise of free speech and petition: defendants still faces the burden of litigation and potential liability for acts deemed protected by the SLAPP statute. [Citation.] We conclude paragraphs 31(o) and (p) are not merely incidental to the third and fourth causes of action." (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures*, *supra*, 184 Cal.App.4th at pp. 1551-1552, italics omitted.)

Here, we cannot say that the incidents involving protected activity were merely incidental or collateral. Much as in *Haight Ashbury*, the Boswells' claims were expressly based on those incidents, as well as on the incidents not involving protected activity. Significantly, the incidents in which appellants sought to enforce the Association's rules occurred in or before 2014; they generally ended with the Boswells getting what they wanted, and the Boswells did not see fit to bring suit based on them alone. The surveillance incidents were few and only minimally intrusive. Thus, if anything, it would seem to be the incidents of *unprotected* activity that were merely incidental.

We therefore conclude that the emotional distress causes of action must be deemed to arise out of protected activity.

B.      *"Probability of Prevailing" Prong*.

"'To establish a probability of prevailing, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.]' [Citation.] We do not 'weigh conflicting evidence to determine

31

whether it is more probable than not that plaintiff will prevail on the claim . . . .'

[Citation.] Instead, our standard of review requires us to consider the defendant's

evidence '"only to determine if it has defeated that submitted by the plaintiff as a matter

of law." [Citation.]' [Citation.]" (*Kurz v. Syrus Systems, LLC* (2013) 221 Cal.App.4th

748, 760.)

"'An anti-SLAPP-suit motion is not a vehicle for testing the strength of a

plaintiff's case, or the ability of a plaintiff, so early in the proceedings, to produce

evidence supporting each theory of damages asserted in connection with the plaintiff's

claims. It is a vehicle for determining whether a plaintiff, through a showing of minimal

merit, has stated and substantiated a legally sufficient claim. [Citations.]' [Citation.]"

(*Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 88-89.)

1.      *Intentional infliction of emotional distress.*

"A cause of action for intentional infliction of emotional distress exists when there

is '""""(1) extreme and outrageous conduct by the defendant with the intention of causing,

or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's

suffering severe or extreme emotional distress; and (3) actual and proximate causation of

the emotional distress by the defendant's outrageous conduct."""" [Citations.]" (*Hughes

v. Pair* (2009) 46 Cal.4th 1035, 1050.)

a.      *Extreme and outrageous conduct.*

Defendants contend that the Boswells failed to show sufficiently extreme and

outrageous conduct.

"A defendant's conduct is 'outrageous' when it is so ""'extreme as to exceed all bounds of that usually tolerated in a civilized community.'"' [Citation.]" (*Hughes v. Pair*, *supra*, 46 Cal.4th at pp. 1050-1051.) "Liability for intentional infliction of emotional distress '"does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' [Citations.]" (*Id*. at p. 1051.)

Our research has not revealed a case involving conduct similar to that of defendants. Evidently the parties have not found any cases with similar facts, either; certainly they do not cite any. Nevertheless, we set out the fact situations in a few cases as guideposts.

In *So v. Shin* (2013) 212 Cal.App.4th 652, a patient who awoke while having a procedure after a miscarriage complained to the anesthesiologist; the anesthesiologist allegedly responded by shoving a container full of the patient's blood "and possible fragments of body parts of her dead baby" at her. (*Id*. at pp. 656-657.) This was held to be extreme and outrageous conduct. (*Id*. at pp. 671-673.)

Inducing a borrower to skip a loan payment, refusing to accept further loan payments from her, and then foreclosing on her home is also extreme and outrageous conduct. (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 188-191, 204-205.)

Publicly making false allegations that a pastor is "'a "child molester," "corrupt," and "stealing money from the church"'" is extreme and outrageous conduct. (*Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 477-479, 486-487.)

33

On the other hand, an insurance adjuster's "appalling" conduct — including altering the scene of the incident before photographing it, making derogatory comments about the insured's employer, misrepresenting the coverage under the policy, falsely stating that the insured had denied certain elements of damages, hiring an unlicensed contractor, and conspiring with the contractor to prepare a false report — is nevertheless not extreme and outrageous. (*Bock v. Hansen* (2014) 225 Cal.App.4th 215, 219, 221-222, 234-235.)

Inducing employees to remain at the job, and thus to forgo other job offers and opportunities for five years, by falsely promising to pay them a bonus at the end of that time that would be enough for them to retire on at is not extreme and outrageous. (*Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 772-773, 780-781; see also *id.*, at p. 806 [conc. & dis. opn. of Bamattre-Manoukian, J.].)

Finally, retaliating against an employee for filing an unlawful discrimination claim by shunning, ostracizing, and isolating her and denying her access to training is not extreme and outrageous. (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 289-291, 295.)

As before (see part III.A.2, *ante*), we deal with the Boswells' list of 19 emotionally distressing incidents by organizing them into categories.

Again, the first category consists of incidents in which appellants attempted to enforce the Association's rules against the Boswells in a groundless, malicious, and/or harassing manner. This conduct, standing alone, could constitute intentional infliction of

emotional distress. "'[T]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.' [Citations.]" (*Cross v. Bonded Adjustment Bureau* (1996) 48 Cal.App.4th 266, 283.) The repeated nature of the harassment made it even more extreme. As Schmidt himself supposedly implied, the only way out was to move.

For the moment, we skip over the second category. The third category consists of incidents in which appellants denigrated the Boswells to their neighbors and others. Schmidt accused the Boswells of interfering in the affairs of the Association when they were only renters, defaming the Association, inciting fear, behaving unethically, behaving in an un-Christian manner, damaging property values, spreading hate, and running a scam. As a result, some of the Boswells' neighbors came to believe that they were a danger to the neighborhood and to children.[11] This was sufficiently extreme and

---

**11**      For purposes of the first prong of the analysis, defendants argue that their communications were "protected activity" within the meaning of Code of Civil Procedure section 425.16. Significantly, however, for purposes of the second prong of the analysis, they do not argue that their communications were either privileged (see Civ. Code, § 47) or protected by the First Amendment (see *Hustler Magazine, Inc. v. Falwell* (1988) 485 U.S. 46, 56 [public figure cannot recover for intentional infliction of emotional distress based on parody without showing that it contained a false statement of fact made with actual malice]). To the contrary, they "[a]ssum[e] that the Boswells' allegations . . . demonstrate improper and wrongful conduct . . . ."

A fortiori, defendants do not argue that their communications were true, that they were matters of opinion, or that they were made without malice. Finally, they do not argue that the Boswells failed to carry their burden of proof on any of these points. Thus, they have forfeited any such contentions.

outrageous to constitute intentional infliction of emotional distress — particularly when added to the harassing charges of various rule violations.

The second category consisted of surveillance. The fourth category consisted of communications regarding *Anderson v. NWAC*. In light of our conclusion that the incidents in the first and third categories, alone or when combined, were sufficiently extreme and outrageous, we need not decide whether the same is also true of the incidents in these other categories.[12]

        b.     *Severe emotional distress*.

Defendants also contend that the Boswells failed to show that they suffered severe emotional distress.

        i.     *Additional factual and procedural background*.

Boswell testified: "I feel like my home is no longer a home and that I no longer have privacy. . . . I never used to lock my doors or windows, but now I lock the house 100% of the time to ensure the safety and security of my family. I do not feel secure or safe in my gated community or home. I am fearful that Mr. Schmidt is not of sound mind

---

[12] Because the Boswells have shown a probability of prevailing based on both protected and unprotected activity, we also need not consider striking the allegations that are based on protected activity. (Cf. *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 772-773 [Fourth Dist., Div. Two] [when cause of action alleges both (1) unprotected activity, on which plaintiff has probability of prevailing, and (2) protected activity, on which plaintiff does not have probability of prevailing, allegations regarding protected activity may be stricken].)

and could show up at my door at any time.  I do not allow my wife to answer the door for anyone that she is not expecting . . . .

" . . . I have suffered from . . . a lack of sleep, anxiety, stress, paranoia and hopelessness.  I constantly feel like I am looking over my shoulder . . . .

" . . . I went weeks without sleeping naturally.  I had to see a doctor for stress, insomnia, and fatigue.  I have been taking Ambien to sleep and Xanax for the anxiousness and anxiety due to stress.  I have also become sick more often than in the past.  Since January 2015, I have been sick for various infections and have taken prescription medications to combat the illnesses. . . .  I have been sick three times for more than three days.  I have lost the motivation to do the things I love, including riding my bike and working out.  As a result I have gained about 20 pounds in five months."[13]

Mrs. Boswell testified:  "I feel sick to my stomach every time I pull in the guard gate . . . ."  "I am afraid to answer my front door . . . .  I truly am afraid that Mr. Schmidt will show up at my home and do something to harm me or my family."  "I am afraid to attend community functions . . . .  Much of the time I want to bury my head and hide from my neighbors . . . ."  "I am unable to sleep or even truly relax in my own home now;

---

[13]  Boswell also testified:  " . . . I continually worry about if I will be able to survive financially and support my family *as a result of having to defend the lawsuit* . . . ."  (Italics added.)  As this relates to defendants' filing this action, which is privileged conduct (see Civ. Code, § 47, subd. (b)), rather than to any of the 19 alleged instances of defendants' emotionally distressing conduct, we disregard it.

and as a result I have to take a prescription sleeping/anxiety medication."  She was "sad and frustrated."

ii. *Discussion*.

"With respect to the requirement that the plaintiff show severe emotional distress, th[e Supreme C]ourt has set a high bar.  'Severe emotional distress means "'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'"'  [Citation.]"  (*Hughes v. Pair*, *supra*, 46 Cal.4th 1035 at p. 1051.)

"[D]iscomfort, worry, anxiety, upset stomach, concern, and agitation" are not enough.  (*Hughes v. Pair*, *supra*, 46 Cal.4th at p. 1051.)  However, a reasonable factfinder could find that "stress, sexual impotence, fatigue, overeating, short temper, withdrawal, bouts of crying, depression, and sleeplessness for which [the plaintiff] took medication" constituted severe distress.  (*Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 216 & 216, fn. 14.)  One case has held that merely shaking with fear for 10 minutes was sufficient — although there the defendants' conduct was relatively outrageous (credible threats to kill plaintiff, plaintiff's wife, and plaintiff's dog) and the jury's award of damages was relatively low ($1,000).  (*Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1614.)

Here, the Boswells suffered from fear, insecurity, insomnia, anxiety, stress, paranoia, and hopelessness.  They both had to take prescription medication.  They were unable to enjoy their home and their neighborhood.  It is significant that this went on for

at least five months.  "[T]he duration of the emotional distress is one of the factors to be considered in determining its severity [citation] . . . ."  (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 398.)  In determining whether the Boswells actually suffered sufficiently severe emotional distress, a jury could take into account the outrageousness of defendants' actions; it could also give the Boswells correspondingly low damages.  On balance, we are persuaded that the Boswells have shown that their claim of severe emotional distress has at least "minimal merit."

We therefore conclude that the Boswells have shown a probability of prevailing on their cause of action for intentional infliction of emotional distress.

### 2. *Negligent infliction of emotional distress*.

"[T]here is no independent tort of negligent infliction of emotional distress. [Citation.]  The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element.  [Citations.]"  (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984-985.)  "[T]here is no duty to avoid negligently causing emotional distress to another[;] . . . damages for emotional distress are recoverable only if the defendant has breached some other duty to the plaintiff.  [Citation.]"  (*Id*. at p. 984.)  "That duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship. [Citation.]"  (*Id*. at p. 985.)

The Boswells do not point to any particular duty imposed by law.  They do invoke the general duty to exercise due care.  (Civ. Code, § 1714.)  However, this approach would eviscerate the principle that there is no duty to avoid negligently causing

39

emotional distress to another. The Boswells also do not claim that defendants assumed any relevant duty.

Rather, the Boswells assert a duty based on a special relationship. They argue that: (1) "[a] homeowners association has a fiduciary relationship with its members";[14] and (2) Schmidt personally authorized and/or participated in the Association's tortious conduct. They cite no authority for the proposition that a fiduciary duty includes a duty not to cause emotional distress (at least in the absence of any other breach of fiduciary duty). "[T]he special relationships that our Supreme Court has deemed sufficient to give rise to a duty of care are clearly related to the plaintiff's mental or emotional well-being. Valid claims for negligent infliction of emotional distress have been found where the defendant breached the duty of care that arises in the physician-patient relationship [citations], as well as in the psychotherapist-patient relationship [citation], and in the relationship between a mortuary and the close relatives of the decedent for whose benefit the mortuary was to provide funeral services [citation]. In short, '[c]ases permitting recovery for emotional distress typically involve mental anguish stemming from more personal undertakings the traumatic results of which were unavoidable.' [Citation.]" (*Gu v. BMW of North America, LLC* (2005) 132 Cal.App.4th 195, 207.) A homeowners association does not make such a personal undertaking — not even to its actual members.

---

[14] This assumes that the Boswells are entitled to be recognized as members of the Association, as they allege in their cause of action for declaratory relief. However, the Boswells have not offered any evidence, authority, or argument to support this assertion. For example, the Association's governing documents are not in the record. We may reject it for this reason alone.

We therefore conclude that the Boswells have not shown a probability of prevailing on their cause of action for negligent infliction of emotional distress.

IV

DISPOSITION

The order denying appellants' anti-SLAPP motion is affirmed in part and reversed in part, as follows. It is affirmed with respect to the first cause of action, for intentional infliction of emotional distress, and the third cause of action, for declaratory relief. It is reversed with respect to the second cause of action, for negligent infliction of emotional distress, and the trial court is directed to enter a new order granting the motion with respect to this cause of action. Appellants are awarded costs on appeal, including attorney fees, against the Boswells in an amount to be determined by the trial court. (Code Civ. Proc., § 425.16, subd. (c)(1); *Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 339-340; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1016-1020; *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1426.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:
MILLER _____
J.
SLOUGH _____
J.

41