# IN THE SUPREME COURT OF CALIFORNIA

GREGORY GEISER,
Plaintiff and Appellant,

v.

PETER KUHNS et al.,
Defendants and Appellants.

S262032

Second Appellate District, Division Five
B279738

Los Angeles County Superior Court
BS161018, BS16019, BS161020

---

August 29, 2022

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, Jenkins, and Guerrero concurred.

---

GEISER v. KUHNS

S262032

Opinion of the Court by Liu, J.

The Legislature enacted Code of Civil Procedure section 425.16 to combat "a disturbing increase" in Strategic Lawsuits Against Public Participation (SLAPPs): "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (Code Civ. Proc., § 425.16, subd. (a); all undesignated statutory references are to this Code.) In *FilmOn.com Inc v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 143 (*FilmOn*), we observed that "[i]n the paradigmatic SLAPP suit, a well-funded developer limits free expression by imposing litigation costs on citizens who protest, write letters, and distribute flyers in opposition to a local project." (See Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended June 23, 1997, pp. 2–3.) As the Assembly Committee on Judiciary observed, approximately 25 percent of SLAPP suits "relate to development and zoning . . . ." (Assem. Com. on Judiciary, Analysis of Sen. Bill. No. 1296, *supra*, as amended June 23, 1997, at p. 3.) The committee recognized that "such lawsuits are often pernicious, masquerading as standard defamation and interference with prospective economic advantage litigation, while really brought by well-heeled parties who can afford to misuse the civil justice system to chill the exercise of free speech . . . by the threat of impoverishing the other party." (*Ibid.*) To protect against these abuses, the Legislature has directed that the anti-SLAPP statute "shall be construed broadly." (§ 425.16, subd. (a).)

As relevant here, the statute's protection extends to "any . . . conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4) (hereafter section 425.16(e)(4)).) This provision — the so-called catchall provision in the statute's enumeration of " 'act[s] in furtherance of a person's right of petition or free speech' " (§ 425.16, subd. (e)) — was the subject of our recent decision in *FilmOn*. There, we articulated a two-step inquiry for deciding whether the activity from which a lawsuit arises falls within section 425.16(e)(4)'s protection: first, we ask what public issue or issues the challenged activity implicates, and second, we ask whether the challenged activity contributes to public discussion of any such issue. (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.) If the answer to the second question is yes, then the protections of the anti-SLAPP statute are triggered, and the plaintiff in the underlying lawsuit must establish "a probability" of prevailing before the action may proceed. (§ 425.16, subd. (b).)

The case before us features a sidewalk picket purporting to protest a real estate company's business practices after the company evicted two long-term residents from their home. The Court of Appeal held the activity at issue to be beyond the scope of anti-SLAPP protection, concluding that the picket did not implicate a public issue and concerned only a private dispute between the company and the residents it had evicted. We granted review to clarify the proper application of *FilmOn*'s two-part test. Applying both steps of the *FilmOn* analysis, we hold that the sidewalk protest constitutes protected activity within the meaning of section 425.16(e)(4). We remand for further proceedings consistent with this opinion.

# I.

Mercedes and Pablo Caamal shared a home in Rialto, California for nearly ten years. They purchased the property for $450,000 in 2006 using funds from two mortgages they obtained from Wells Fargo without any cash up front. Both Caamals lost their jobs in the aftermath of the financial crisis of 2008; by 2012, they had fallen behind on their mortgage payments. In September 2015, the mortgagor held a foreclosure auction, at which an affiliate of Wedgewood, LLC — a company "focused on the purchase, rehabilitation, and resale of distressed properties" — purchased the home for $284,000. Wedgewood filed unlawful detainer actions to evict the Caamals.

The Caamals sought help from the Alliance of Californians for Community Empowerment (ACCE), an organization whose mission is "to save homes from foreclosures" and to "fight against the displacement of long-term residents." On December 17, 2015, several ACCE supporters — including the organization's Los Angeles director, Peter Kuhns — accompanied the Caamals to Wedgewood's headquarters. The group requested a meeting with Gregory Geiser, Wedgewood's chief executive officer, to discuss the possibility of the Caamals repurchasing their home. They set up a tent in the building's lobby and refused to leave until such a meeting transpired. Geiser alleges that one of the activists shoved a Wedgewood employee when that employee attempted to remove the tent. Wedgewood's chief operating officer and its general counsel eventually offered to meet with the Caamals if the ACCE activists vacated the premises. The Caamals agreed, and the ACCE activists departed.

At the meeting, the Caamals expressed their desire to repurchase the property. Without discussing a specific price, Wedgewood employees proposed to stay the eviction proceedings for several weeks to enable the Caamals to obtain financing. In January 2016, the parties made this agreement known to the court; the eviction proceedings were stayed for 60 days pending negotiation of the proposed repurchase. Although the details of those negotiations are disputed, the parties agree that on March 12, 2016 — shortly before the 60-day period expired — the Caamals mailed to Wedgewood, on ACCE letterhead, a letter asserting they had secured prequalification for a $300,000 loan. Wedgewood found that unacceptable. The Caamals remained in their home as the 60-day period lapsed.

On March 23, 2016, the Caamals and several ACCE supporters returned to Wedgewood's headquarters and sought another meeting with Geiser. Wedgewood's chief operating officer again offered to meet with the Caamals and discuss the situation if the ACCE supporters agreed to disperse. The Caamals again accepted, and the protestors again departed. No agreement was reached at the meeting. Over the next few days, articles describing the controversy appeared in the Huffington Post and in the Spanish-language newspaper La Opinión.

On March 30, 2016, Wedgewood locked the Caamals out of the property. The Caamals again turned to ACCE. Together, they organized a demonstration that evening on the public sidewalk outside of Geiser's residence in Manhattan Beach. About 25 to 30 demonstrators attended. According to sworn testimony from Kuhns and the Caamals, the demonstrators "held signs, sang songs, and gave short speeches in protest of Wedgewood"; the record does not disclose the precise content of

the signs, songs, or speeches. The only utterance that the record discloses verbatim is a chant used by the demonstrators as they picketed outside Geiser's residence: "Greg Geiser, come outside! Greg Geiser, you can't hide!" Around 10:00 p.m., Pablo Caamal thanked the demonstrators for their support and declared that the demonstration was over. The demonstrators then dispersed.

Multiple Manhattan Beach police officers were present for much of the demonstration, as was Gilbert Saucedo, a member of the National Lawyers Guild who volunteered to observe. According to Saucedo, the demonstration had been organized by ACCE "to protest unfair and deceptive practices" used by Wedgewood in acquiring the property and in evicting the Caamals from their home. Saucedo relayed this information to the commanding officer at the scene. The officers remained present throughout the demonstration and did not intervene. According to Saucedo's declaration, "everyone behaved peacefully and there were no threats of violence at any time."

Geiser saw things differently. Two days after the demonstration, Geiser filed petitions for civil harassment restraining orders against Kuhns and the Caamals. The petitions characterized the picketing as an "assault" on his home by a "mob" that he believed threatened his and his wife's safety. The petitions sought to keep Kuhns and the Caamals at least 100 yards away from Geiser's home and from the Wedgewood headquarters. The trial court issued a temporary restraining order enjoining Kuhns and the Caamals from "picketing or otherwise demonstrating in front of [Geiser's] personal residence."

The litigation attracted more media attention: Breitbart News published an article characterizing the controversy as "a

rare case of a senior executive fighting back against radical left-wing groups like the now-defunct Association of Community Organizers For Reform Now (ACORN)." The article went on to argue that ACCE's policy agenda concerning foreclosures and evictions could "put owners of rental properties at real risk."

Kuhns and the Caamals moved to strike the civil harassment petitions under the anti-SLAPP statute. Their motion alleged that the demonstration implicated a public issue because the business practices by which Wedgewood evicted the Caamals exemplified "one of the many stories of hundreds of thousands who lost their homes since 2008 in the Great Recession." Geiser voluntarily dismissed the petitions before the motions could be resolved. Within days of the dismissals, Wedgewood issued a press release alleging that it had endeavored to negotiate a settlement with the Caamals and that despite "the company's sincere good-faith efforts," ACCE "unilaterally decided to pursue its own agenda to the detriment of the Caamals." The press release decried ACCE for "portray[ing] the Caamal family as victims, while exploiting a very emotional issue . . . to further its own agenda."

Motions for attorneys' fees followed. In those motions, Kuhns and the Caamals asserted that, as prevailing parties on an anti-SLAPP motion to strike, they were entitled to full recovery of attorneys' fees — a total of $84,150 — under section 425.16, subdivision (c)(1).

The trial court rejected the argument that Kuhns and the Caamals had prevailed under the anti-SLAPP statute. In the court's view, the March 30 demonstrations did not implicate a public issue because they "did not concern people other than the Caamals." In so holding, the trial court relied primarily upon

the declarations of Kuhns and the Caamals, each of which asserted that the March 30 demonstration had been undertaken exclusively to facilitate the repurchase of the property. The trial court nonetheless exercised its discretion to award attorneys' fees under a different statutory provision, section 527.6, explaining that although Kuhns and the Caamals would not have prevailed on their anti-SLAPP motions, they were still "prevailing part[ies]" within the meaning of that statute. The trial court accordingly awarded $40,000 in attorneys' fees, less than half the amount that Kuhns and the Caamals sought under the anti-SLAPP statute. The Court of Appeal affirmed.

We granted review and deferred briefing pending our decision in *FilmOn*, where we construed the catchall provision of the anti-SLAPP statute. Section 425.16, subdivision (e) sets forth four types of activity that trigger the statute's protections. The fourth — the catchall — covers "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16(e)(4).) In *FilmOn*, we articulated a two-step inquiry to determine whether the conduct from which the lawsuit arises falls within the catchall. "First, we ask what 'public issue or . . . issue of public interest'" is implicated by the challenged activity. (*FilmOn*, *supra*, 7 Cal.5th at p. 149.) Second, we look to the "functional relationship" between the challenged activity and the public issue it implicates, and ask whether the activity contributed to public discussion of that issue. (*Id.* at pp. 149–152.)

We transferred this case to the Court of Appeal for reconsideration in light of *FilmOn*. The Court of Appeal again affirmed, maintaining that the demonstration outside Geiser's

home "focused on coercing Wedgewood into selling back the property to Ms. Caamal at a reduced price, which was a private matter concerning a former homeowner and the corporation that purchased her former home and not a public issue." Like the trial court, the Court of Appeal rested its holding on the declarations submitted in support of the anti-SLAPP motion. It emphasized that the Caamals disclosed in their declarations that their actions were motivated by a desire to repurchase their former residence, and that the declarations neither endeavored to detail "Wedgewood's residential real estate business practices" nor to explain how such "large scale fix-and-flip" operations were related to the Great Recession and its attendant ills. On this basis, the Court of Appeal reasoned that the true "motivation" for the protests "was purely personal to the Caamals and did not address any societal issues of residential displacement, gentrification, or the root causes of the great recession." The Court of Appeal also emphasized that "[t]he only evidence of the specific content of the speeches during the demonstration at plaintiff's residence was that the demonstrators demanded [Geiser] personally come out of his home."

The Court of Appeal went on to address the second step of the *FilmOn* analysis: "[E]ven if we accepted defendants' contention that the demonstrations concerned the issues of displacement of residents due to residential real estate business practices, gentrification, and large scale fix-and-flip real estate practices leading to the great recession, those demonstrations did not qualify for statutory protection because they did not further the public discourse on those issues." It justified this conclusion with the same reasoning that animated its first-step

analysis: that the demonstrations were undertaken only "for the purpose of coercing Wedgewood into selling back the property" to the Caamals and therefore "did not further the public discourse."

Justice Baker dissented. He noted our observation in *FilmOn* that "[i]n the paradigmatic SLAPP suit, a well-funded developer limits free expression by imposing litigation costs on citizens who protest, write letters, and distribute flyers in opposition to a local project." (*FilmOn*, *supra*, 7 Cal.5th at p. 143.) In his view, that sentence "suffice[d] almost by itself to point the way to the correct result here. . . . Well-funded developer? Check. Citizen protest of a local (evict-and-flip housing) project? Check. Limits on free expression by imposing litigation costs? Check. . . . [T]his case has many of the hallmarks of vintage SLAPP conduct."

Turning to *FilmOn*'s two-step test, Justice Baker emphasized Kuhns's characterization of ACCE as "an entity dedicated to 'sav[ing] homes from foreclosures and the fight against displacement of long[-]term residents in our communities.' " "With that mission," he explained, "ACCE's participation in the protest is enough by itself to infer [that] the content of the public protest outside Geiser's home concerned unfair (at least as perceived by ACCE) housing practices that displace long-time community residents." Rejecting the Court of Appeal's "parsing" of the Caamals' declarations, he would have held that the demonstration outside Geiser's residence implicated public issues concerning "displacement of long-term community residents by unfair foreclosure and fix-and-flip housing practices." Proceeding to *FilmOn*'s second step, he explained that "[t]he identity of defendants, the audience they

sought, and the timing and location of the speech all show a degree of closeness between the protest and the ongoing public conversation about housing displacement." "Stated simply," he concluded, "the public protest contributed to the public debate."

We again granted review.

## II.

In *FilmOn*, we observed that "[o]ur courts have ably distilled the characteristics of 'a public issue or an issue of public interest.' (§ 425.16, subd. (e)(4).)" (*FilmOn*, *supra*, 7 Cal.5th at p. 149, citing *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919–924 (*Rivero*) and *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133.) The court in *Rivero*, upon surveying the case law, said that statements found to implicate a public issue generally "concerned a person or entity in the public eye[,] . . . conduct that could directly affect a large number of people beyond the direct participants[,] . . . or a topic of widespread, public interest." (*Rivero*, at p. 924, citations omitted.) The *Weinberg* court distilled "some attributes of [an] issue which make it one of public, rather than merely private, interest," including the fact that the issue is "of concern to a substantial number of people" or has "been the subject of extensive media coverage." (*Weinberg*, at pp. 1132, 1133.)

At the same time, our opinion in *FilmOn* described as "less than satisfying" various decisions that had rejected anti-SLAPP motions on the ground that the activity from which the litigation arose was not in connection with a public issue. (*FilmOn*, *supra*, 7 Cal.5th at p. 149; see *ibid.*, citing *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 85 (*Bikkina*); *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th

1561, 1572 (*World Financial Group*); *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111 (*Mann*).) Although we expressed no opinion as to the appropriate outcomes in those cases, we disapproved their reasoning — in particular, their insistence that the challenged conduct implicated only a private dispute and not an issue of public interest. (*FilmOn*, at p. 149.)

In *Bikkina*, an engineering professor accused a student he had once advised of having falsified data in two academic papers on carbon sequestration. (*Bikkina, supra*, 241 Cal.App.4th at pp. 75–76.) The professor relayed the accusations to the student's superiors and colleagues, once at an academic presentation and another time at the student's place of employment. (*Id.* at p. 76.) The student sued for libel; the professor responded with an anti-SLAPP motion, arguing that his allegedly libelous statements were entitled to anti-SLAPP protection because they were made in connection with "public discourse on carbon sequestration and its impacts on global warming." (*Id.* at p. 77.) The court disagreed. In its view, the professor's statements were "about data in papers on carbon sequestration" — specifically, allegations "about contaminated quartz samples and plagiarism in two [academic] papers" — and not about "climate change generally." (*Id.* at p. 83.)

In *World Financial Group*, after several former employees of an insurance company took jobs with a competitor, the insurance company sued, alleging that the competitor had unlawfully solicited the former employees and that the former employees were using confidential information and trade secrets unlawfully to benefit the competitor. (*World Financial Group, supra*, 172 Cal.App.4th at pp. 1565–1566.) The competitor invoked the anti-SLAPP statute, asserting that its

communications were protected because they pertained to " 'workforce mobility and free competition.' " (*Id.* at p. 1572.) The court rejected this argument, insisting that "defendants' communications were not 'about' these broad topics . . . . They were merely solicitations of a competitor's employees and customers undertaken for the sole purpose of furthering a business interest." (*Ibid.*)

In *Mann,* two independent contractors for a company spread false accusations to customers and to government agencies that the company "used illegal and carcinogenic chemicals" for maintaining industrial water systems. (*Mann, supra,* 120 Cal.App.4th at p. 100.) After the company sued, the contractors asserted that the alleged statements implicated an issue of public interest. (*Id.* at p. 111.) The court acknowledged that "pollution can affect large numbers of people and is a matter of general public interest," but held that the statements "were not about pollution or potential public health and safety issues in general, but about [the company's] specific business practices." (*Ibid.*)

Was the speech at issue in *Bikkina* about data in papers on carbon sequestration or about climate change? Were the communications at issue in *World Financial Group* about the defendant's own business interests or about the practice and market implications of imposing non-compete clauses? Were the statements at issue in *Mann* about one company's specific business practices or about pollution and public health and safety? We said in *FilmOn* that to the extent these decisions focused "on discerning a single topic of speech," their reasoning was "less than satisfying" because "speech is rarely 'about' any single issue." (*FilmOn, supra,* 7 Cal.5th at p. 149.)

We articulated the two-part test in *FilmOn* to steer courts away from this mode of analysis. In order to determine the scope of section 425.16(e)(4)'s protection, we first "ask what 'public issue or [] issue of public interest' " is implicated by the challenged activity. (*FilmOn, supra,* 7 Cal.5th at p. 149.) Second, we look to the "functional relationship" between the challenged activity and the "public conversation" about that issue, and ask whether the activity " 'contribute[s]' " to public discussion of the issue. (*Id.* at pp. 149–150.) We explained that it is *FilmOn*'s second step, not its first, that usually plays the more prominent role in screening anti-SLAPP motions because caselaw "demonstrate[s] that virtually always, defendants succeed in drawing a line — however tenuous — connecting their speech to an abstract issue of public interest." (*Id.* at p. 150.) We note, however, that "virtually always" does not mean "always"; a defendant may fail to meet its first-step burden. And where the first step is satisfied, it performs an important function in the inquiry: It operates as a lens that focuses the analysis at the second step. In other words, to assess whether the challenged activity contributes to discussion of a public issue, we must identify some public issue that the challenged activity purports to address.

## III.

We review de novo whether Kuhns and the Caamals have met their burden of demonstrating that the activity from which the lawsuit arises falls within the scope of the anti-SLAPP statute's protection. (*Park v. Bd. of Trs. of Cal. State Univ.* (2017) 2 Cal.5th 1057, 1061, 1067.)

13

## A.

The Court of Appeal held that defendants' demonstration outside Geiser's home "focused on . . . a private matter concerning a former homeowner and the corporation that purchased her former home," and not on "any societal issues of residential displacement, gentrification, or the root causes of the great recession." We do not see why defendants' expressive activity fits only one characterization and not both.

The Court of Appeal, applying *FilmOn*, emphasized that "[t]he only evidence of the specific content of the speeches during the demonstration at plaintiff's residence was that the demonstrators demanded plaintiff personally come out of his home." We find unpersuasive this narrow parsing of the record because it ignores inferences that can reasonably be drawn from the events described in defendants' declarations.

As an initial matter, even a narrow focus on the words of the declarations yields a clue that defendants' protest outside Geiser's home implicated a public issue. Saucedo, the volunteer observer from the National Lawyers Guild, said in his declaration that the purpose of the demonstration was " 'to protest unfair and deceptive practices used by Wedgewood . . . in acquiring the real property of [the Caamals], and evicting them from their home.' " As Justice Baker observed, "The reference to 'practices' suggests conduct that includes — but extends beyond — the Caamals' own situation." (Cf. *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 379 [" 'Pattern-or-practice suits, by their very nature, involve claims of classwide discrimination.' "].)

Separate and apart from Saucedo's declaration, there are several indicators that the protest implicated public issues

concerning unfair foreclosure practices and residential displacement. The record shows that the Caamals were long-term residents who faced foreclosure after they lost their jobs in the Great Recession. After Wedgewood purchased the Caamals' residence at a foreclosure auction and moved to evict them, the Caamals sought assistance from ACCE, an advocacy organization committed to "fight[ing] against the displacement of long[-]term residents" and to "sav[ing] homes from foreclosures." ACCE evidently viewed the Caamals' situation as an occasion to further this advocacy mission. It first endeavored to assist the Caamals by organizing sit-ins at Wedgewood's place of business. When that failed, it took its views to a public sidewalk, where it staged the demonstration at issue here, in which the Caamals and approximately 25 to 30 ACCE members picketed.

In this context, the picketers' chant — "Greg Geiser, come outside! Greg Geiser, you can't hide!" — cannot be reduced to a bare demand that Geiser emerge from his home. It can reasonably be understood to mean that Geiser should be ashamed of, or accountable for, the business practices by which the Caamals were displaced from their long-term residence, and that Geiser could not hide from that accountability. Some may not find that slogan especially compelling, but as we explained in *FilmOn*, "our inquiry does not turn on a normative evaluation of the substance of the speech." (*FilmOn*, *supra*, 7 Cal.5th at p. 151.)

Moreover, there is no evidence that the 25 to 30 ACCE members who participated in this public demonstration at 9:00 p.m. on a Wednesday evening had any personal connection with, or loyalty to, the Caamals in particular. It is common knowledge

that foreclosures, evictions, and inadequate housing are major issues in communities throughout California, and the participation of more than two dozen members of an advocacy group dedicated to fighting foreclosures and residential displacement must be considered against that backdrop. (See *Ohio Bell Tel. Co. v. Comm'n* (1937) 301 U.S. 292, 301 ["Courts take judicial notice of matters of common knowledge."]; cf. *ibid.* ["They take judicial notice that there has been a depression, and that a decline of market values is one of its concomitants."].) As Justice Baker explained, "the only apparent shared tie among everyone present was the desire to engage in public speech consistent with ACCE's mission and the issue of public interest identified here: combatting unfair housing and foreclosure practices that displace long-term community residents."

The Court of Appeal overlooked the ways in which these contextual considerations inform the expressive meaning of the protest outside Geiser's home. It is true that *FilmOn*, in stating the two-step test for determining whether expressive activity falls within section 425.16(e)(4)'s protection, said that the first step poses "a question we answer by looking to the content of the speech" and that "[i]t is at the [second] stage that context proves useful." (*FilmOn, supra*, 7 Cal.5th at pp. 149–150.) Geiser argues that this language supports the Court of Appeal's parsing of the picketers' chant. But we had no occasion in *FilmOn* to probe the contours of the first-step analysis, and we made no ruling on any first-step dispute. Instead, we assumed without deciding that the speech at issue did implicate issues of public interest, and we focused our inquiry on the second-step question of whether the defendant's statements — in light of the "context" in which they were made, "including audience,

speaker, and purpose" — contributed to public debate on those issues. (*Id.* at p. 152.) The public issues we assumed to be implicated (i.e., copyright violations and children's exposure to adult media) were apparent from the content of the defendant's speech. (*Ibid.*) To the extent that part of our opinion in *FilmOn* suggests the first-step inquiry focuses on "the content of the speech" (*id.* at p. 149) without consideration of its "context" (*id.* at p. 150), it is not controlling because that issue was not presented in *FilmOn* and " ' "cases are not authority for propositions not considered" ' " (*B.B. v. City of Los Angeles* (2020) 10 Cal.5th 1, 11; see *People v. Ceballos* (1974) 12 Cal.3d 470, 481.)

Our central theme in *FilmOn* was that, in analyzing whether a statement falls within the ambit of section 425.16(e)(4), "[i]t would be all but impossible . . . to justify ignoring the ordinary contextual cues affecting how people generally evaluate speech." (*FilmOn, supra*, 7 Cal.5th at p. 145; see *id.* at p. 146 ["[t]he court below erred" by analyzing speech "deracinated of context"]; *ibid.* ["section 425.16 invites courts to consider the context in which statements were made"]; *id.* at p. 148 ["context matters under the catchall provision"].) Although we made these observations in elaborating the second-step inquiry, they also apply at the first step. "Language, of course, cannot be interpreted apart from context" (*Smith v. United States* (1993) 508 U.S. 223, 229), and what a particular statement or act is "about" often cannot be discerned from words alone.

The history of the anti-SLAPP statute is instructive on this point. As originally enacted, section 425.16, subdivision (e) enumerated three categories of protected activity, each of which

required some written or oral statement. In 1997, the Legislature added the catchall provision (§ 425.16, subd. (e)(4)) in order to ensure that "expressive conduct" would be protected. (Sen. Judiciary Com., Analysis of Sen. Bill. No 1296 (1997–1998 Reg. Sess.) as amended May 12, 1997, pp. 3–4; see Stats. 1997, ch. 271, § 1.) Drawing upon this legislative history, we have said that "[a]t a minimum, [section 425.16(e)(4)] shields expressive conduct — the burning of flags, the wearing of armbands, and the like — that, although not a 'written or oral statement or writing' (§ 425.16, subd. (e)(1)–(3)), may similarly communicate views regarding 'matters of public significance.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 893; *id.* at p. 893, fn. 9; see *FilmOn, supra,* 7 Cal.5th at pp. 143–144 [section 425.16, subd. (e)(1)–(3) defines protected conduct "not only by its content, but also by its location, its audience, and its timing," and such "contextual information" is not excluded from consideration under section 425.16(e)(4)]; *id.* at p. 148 ["speaker, audience, and purpose" are "contextual factors" to be considered under section 425.16, including the catchall provision].)

In *Tinker v. Des Moines School District* (1969) 393 U.S. 503, 504, for example, a group of students wore black armbands to school in a symbolic protest against the Vietnam War. The armbands do not appear to have included any writing. If they were considered in isolation, it would be difficult to tell that they expressed any ideas at all, much less opposition to the Vietnam War. It is in the context of the full controversy — from the students' coordinated plan to wear the armbands to the school's disciplinary response — that the ideas expressed by the armbands come into view. (*Id.* at pp. 505–506.)

Here, the public issue that is reasonably implicated by defendants' demonstration comes into view when the challenged conduct is situated within its broader context. This context includes the identity of the speakers or participants (25 to 30 members of a housing advocacy organization), the picket's location and audience (a public sidewalk outside the residence of the CEO of a major real estate development company), and its purpose and timing (to protest residential displacement practices immediately after a couple had been evicted from their long-term home). Against this backdrop, the declarations describing ACCE's mission and the events leading up to the picket, together with Saucedo's declaration describing the picket as a "protest" of the "unfair and deceptive practices used by Wedgewood," give rise to a reasonable inference that the demonstration implicates controversial real estate practices that many individuals and communities find destabilizing — unquestionably an issue of public interest. (See *Rivero*, *supra*, 105 Cal.App.4th at p. 924 [speech concerning "a topic of widespread . . . interest" implicates a public issue].)

We now make explicit the standard that is implicit in the analysis above: *FilmOn*'s first step is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute. Only when an expressive activity, viewed in context, cannot reasonably be understood as implicating a public issue does an anti-SLAPP motion fail at *FilmOn*'s first step.

## B.

We also granted review to decide whether courts should defer to anti-SLAPP movants in determining whether a public

issue is implicated at *FilmOn*'s first step. Kuhns and the Caamals argue that the Court of Appeal erred because it failed to afford sufficient deference to their contentions that the picket broadly implicated issues of foreclosure and eviction practices in the wake of the Great Recession. Geiser responds that such deference would empower anti-SLAPP movants to "fabricate[]" "retroactive" characterizations of their speech or conduct. We hold that *FilmOn*'s first step calls for an objective inquiry, without deference to the movant's framing or personal motivations. A court evaluating an anti-SLAPP motion should take the position of a reasonable, objective observer. (See *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 65 ["[O]ur anti-SLAPP statute utilizes a reasonable, objective test that lends itself to adjudication on pretrial motion"].)

Kuhns and the Caamals insist that "a speaker is in the best position to know the content and purpose of his speech," whereas Geiser worries that anti-SLAPP movants may intentionally mischaracterize their activities. But these concerns are misplaced. *FilmOn*'s first step asks what issue or issues the challenged activity may reasonably be understood to implicate. On that question, the movant's beliefs, motivations, or characterizations may be relevant and, if objectively reasonable, will inform the analysis. But they are not themselves dispositive and, if not objectively reasonable, will not carry weight. If a reasonable inference can be drawn that the challenged activity implicates a public issue, then the analysis proceeds to *FilmOn*'s second step.

The Court of Appeal's parsing of the Caamals' declarations reflects a related confusion. The court reasoned that because

the declarations indicated that the Caamals were moved to action by a desire to repurchase their home, the sidewalk demonstration implicated only their "purely personal" interest in facilitating a repurchase of the property. But those who speak on public issues are often driven to do so by circumstances that affect them personally. A woman who has suffered workplace harassment might be moved to speak out about her own experiences. The fact that she foregrounds harms she herself has experienced does not mean an objective observer could not reasonably understand her story, in context, to implicate societal issues of workplace harassment. Similarly here, although the protest in front of Geiser's home stemmed from the Caamals' personal interest in regaining their property, this does not mean that an objective observer could not reasonably understand the protest, in context, to implicate public issues of unfair foreclosure and residential displacement practices. Again, the touchstone is objective reasonableness.

## IV.

We turn now to *FilmOn*'s second step. As with its first-step analysis, the Court of Appeal's analysis at the second step did not give appropriate weight to the context in which the sidewalk demonstration arose. The Court of Appeal reasoned that because the sidewalk protest was "directed at Wedgewood and [Geiser] . . . for the purpose of coercing Wedgewood into selling back the property," it "did not further the public discourse on the issues of displacement of residents due to residential real estate business practices, gentrification, or large scale fix-and-flip real estate practices leading to the great recession."

But, as explained, the demonstration was not only about the dispute over the Caamals' long-term residence, but also about broader issues concerning unfair foreclosures and evictions. While the protest might have served the purpose of facilitating a repurchase of the property, as the Court of Appeal supposed, it also served to draw attention to the alleged unfairness of the business practices by which the Caamals were foreclosed upon and evicted. ACCE's participation in the protest must be understood with the latter purpose in mind. The context makes clear that this sidewalk protest furthered public discussion of the public issues it implicated. It is a paradigmatic example of "conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

This conclusion is bolstered by the media coverage arising from the controversy and by the press release Wedgewood issued in response to it. That press release accused ACCE, an organization that fights foreclosures and displacement of long-term residents, of "portray[ing] the Caamal family as victims, while exploiting a very emotional issue . . . to further its own agenda." This language suggests that Wedgewood recognized not only that the protest implicated public issues, but also that the protest bore some connection to the "further[ance]" of ACCE's "agenda." This is not to say that a protest must receive media attention in order to be protected under the anti-SLAPP statute. As we explained in *FilmOn*, "[w]e are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction . . . ." (*FilmOn, supra*, 7 Cal.5th at p. 151.) We simply note that when the conduct that gives rise to a lawsuit attracts such

media attention, it can be an indicator that such conduct was undertaken "in connection with" a public issue. (§ 425.16, subd. (e)(4).)

Finally, we observe that our analysis here at *FilmOn*'s second step overlaps with our analysis at the first step. Many of the same contextual considerations that compel us to conclude that the protest implicated public issues also compel us to conclude that the protest furthered public discussion of them. In cases like this one, it may be more efficient to look to the whole context from which the conduct underlying the lawsuit arises, rather than attempting to parse which considerations fall under which of *FilmOn*'s two steps.

## CONCLUSION

"Speech is often provocative and challenging." (*Terminiello v. City of Chicago* (1949) 337 U.S. 1, 4.) But our legal tradition recognizes the importance of speech and other expressive activity even when — perhaps especially when — it is uncomfortable or inconvenient. The Legislature enacted the anti-SLAPP statute to safeguard that tradition against those who would use the judicial process to chill speech they oppose.

Here, the Court of Appeal erred in holding that the demonstration outside Geiser's home did not constitute speech in connection with a public issue under the anti-SLAPP statute's catchall provision. We reverse the judgment of the Court of Appeal and remand this matter to that court for further proceedings consistent with this opinion.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Geiser v. Kuhns

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 2/28/20 – 2d Dist. Div. 5
**Rehearing Granted**

_____

**Opinion No.** S262032
**Date Filed:**  August 29, 2022

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Armen Tamzarian

_____

**Counsel:**

Dinsmore & Sandelmann, Frank Sandelmann, Brett A. Stroud and Joshua A. Valene for Plaintiff and Appellant.

Law Office of Matthew Strugar, Matthew Strugar; Law Office of Colleen Flynn and Colleen Flynn for Defendants and Appellants.

David Greene and Shayana Kadidal for Center for Constitutional Rights, Electronic Frontier Foundation, American Civil Liberties Union of Southern California, Sierra Club, Civil Liberties Defense Center, Greenpeace, Inc., Palestine Legal, National Lawyers Guild, Partnership for Civil Justice Fund, Mosquito Fleet, Portland Rising Tide, Amazon Watch, Center for International Environmental Law, the International Corporate Accountability Roundtable, the First Amendment Project and PILnet as Amici Curiae on behalf of Defendants and Appellants.

Davis Wright Tremaine, Thomas R. Burke, Rochelle L. Wilcox, Dan Laidman and Abigail Zeitlin for California News Publishers Association, the Center for Investigative Reporting, Inc., the First Amendment Coalition, First Look Institute, Inc., Hearst Corporation, KQED Inc., Los Angeles Times Communications LLC, Motion Picture Association, Inc., the New York Times Company, Online News Association, the Reporters Committee for Freedom of the Press and the Washington Post as Amici Curiae on behalf of Defendants and Appellants.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Frank Sandelmann
Dinsmore & Sandelmann, LLP
324 Manhattan Beach Boulevard, Suite 201
Manhattan Beach, CA 90266
(310) 905-3240

Matthew Strugar
Law Office of Matthew Strugar
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010
(646) 797-1853